# MARY LAUN v. ST. LOUIS & SAN FRANCISCO RAILROAD COMPANY, Appellant.

### Division One, February 25, 1909.

1. **NEGLIGENCE: Pleading: Humanitarian Doctrine.** A charge that defendant carelessly and negligently ran its train upon and against deceased, after its employees knew or by the exercise of ordinary care might have known of the perilous situation of deceased, is an appropriate pleading of the humanitarian doctrine.

2. ————: **Contributory: Not Looking.** If deceased did not look or listen for the approaching train until he was on the main track, at a street crossing, where by looking he could have seen it for at least a quarter of a mile away, and coming upon a straight and unobstructed track, he was guilty of negligence that bars his wife's recovery, although defendant railroad company was at the time guilty of negligence in running the train in excess of ordinance speed.

3. ————: ————: **The Track a Signal of Danger.** A railroad track, of and within itself, is a signal of danger, and a pedestrian cannot carelessly attempt to cross the same, at a public street crossing, without using some care for his own protection. The amount of care may vary with the surroundings, but in any condition he must use the senses with which he is endowed for his own protection, or at least some of them; and where, under the evidence, to look was to have seen, and to listen was to have heard, but he did neither, but was killed by defendant's train running at an unlawful speed, his contributory negligence bars his wife's action, and a verdict for her cannot stand.

4. ————: ————: **Looking But Hurrying Across.** The weight of the evidence is that the deceased pedestrian, while he was in a place of safety in the twenty-foot space between the switch and the main line, but nearer to the main line, at the public street crossing, did look and see the train which was approaching at a speed of 30 to 35 miles an hour, but took the chances, and hurrying or jumping attempted to cross in front of it, but was hit by it. Every witness who saw it recognized its rapid speed. *Held*, that it will not do to say he perhaps thought the train was running at the legal ordinance rate of six miles an hour and that by hurrying he could cross in safety, but what every other witness saw he must be held to have seen, and there being no room in the case for the humanitarian doctrine, to permit a verdict for plaintiff to stand would be to wholly ignore the doctrine of contributory negligence.

Appeal from Gasconade Circuit Court.—*Hon. R. S. Ryors*, Judge.

REVERSED.

*W. F. Evans* and *Woodruff & Mann* for appellant.

(1) That it is such negligence for one to attempt to cross or go upon a railway track at a public crossing, or elsewhere, without looking and listening for an approaching train, as precludes a recovery for an injury sustained by him from a passing train or locomotive, whether the company's negligence also contributed directly to produce the injury or not, has so often been decided by this court that it is now regarded as the settled law of this State. Kelly v. Railroad, 75 Mo. 140; Huggard v. Railroad, 134 Mo. 679; Hayden v. Railroad, 124 Mo. 567; Kelsay v. Railroad, 129 Mo. 362; Hook v. Railroad, 162 Mo. 581; Holwerson v. Railroad, 157 Mo. 216. (2) Every person who goes on a railroad track or purposes to cross it must use his eyes and ears to avoid injury, and every intelligent person who has arrived at years of discretion is presumed to know that it is dangerous to be on a railroad track when trains are passing, and when crossing one he is expected to be vigilant and watchful of the approach of a locomotive. Failure to exercise such vigilance is negligence *per se*. Baker v. Railroad, 122 Mo. 533; Lane v. Railroad, 132 Mo. 4; Schmidt v. Railroad, 191 Mo. 215; Holland v. Railroad, 210 Mo. 350. (3) And the rule of contributory negligence is not changed or abrogated by reason of the statute or ordinance imposing the duty, on account of the violation of which the injury resulted. Schmidt v. Railroad, supra; Weller v. Railroad, 120 Mo. 653. (4) The statute or ordinance limiting the rate of speed does not absolve persons approaching public railway crossings from exercising common prudence to avoid danger, nor shift the responsibility to the railroad

should injury ensue from the failure to exercise it. Kenney v. Railroad, 105 Mo. 284; Sweeney v. Railroad, 105 Mo. 396; Evans v. Railroad, 178 Mo. 508; Ries v. Railroad, 179 Mo. 1; Holland v. Railroad, 210 Mo. 351. (5) Defendant's demurrer should have been sustained, because it has always been the law in this State that it is such gross negligence as precludes a recovery for a person to step on a railroad track directly in front of an approaching train, and so close as to render it impossible to avoid the injury by stopping the train, as was the case in this instance, and this is true even if the train was running at a rate of speed in excess of the city ordinance. Tanner v. Railroad, 161 Mo. 497; Moore v. Railroad, 176 Mo. 544; Watson v. Railroad, 133 Mo. 250; Van Bach v. Railroad, 171 Mo. 338; Mockowick v. Railroad, 196 Mo. 550. (6) Plaintiff's own evidence shows that when deceased looked for the first time at the approaching train, after having negligently failed to look until he was in close proximity to the crossing, the locomotive was then so near him that he deemed it necessary to enter into calculation of his chance to get across in front of it and ran to accomplish that end. It is conclusive that an attempt to cross the path of a locomotive under such circumstances is recklessly negligent. Kelly v. Railroad, 75 Mo. 144; Moore v. Railroad, 176 Mo. 540; Mockowick v. Railroad, 196 Mo. 569.

*Harry Clymer, Lorts & Breuer* and *R. A. Breuer* for respondent.

(1) In determining whether plaintiff is entitled to go to the jury, the evidence and every reasonable deduction to be drawn therefrom which tends to support the cause of action must be considered as true, and every reasonable inference to be drawn from the testimony must be in plaintiff's favor. Buckley v. Kansas City, 156 Mo. 16; Baxter v. Railroad, 103 Mo.

App. 597; Ladd v. Williams, 104 Mo. App. 390; Forbes v. Dunnavant, 198 Mo. 199; McFern v. Gardner, 121 Mo. App. 5. (2) The law presumes, in the absence of affirmative evidence to the contrary, that deceased exercised due and proper care in going upon and in attempting to cross defendant's track. Petty v. Railroad, 88 Mo. 320; Crumpley v. Railroad, 111 Mo. 158; Schlereth v. Railroad, 115 Mo. 100; Weller v. Railroad, 164 Mo. 198; Eckhard v. Railroad, 190 Mo. 613; Goff v. Railroad, 199 Mo. 706; Powers v. Railroad, 202 Mo. 280. Also that he had a right to presume that defendant would obey the ordinances of the city in the management and speed of its trains, and to act on such presumption. Kellny v. Railroad, 101 Mo. 77; Jennings v. Railroad, 112 Mo. 276; Hutchison v. Railroad, 161 Mo. 254; Eckhard v. Railroad, 190 Mo. 613; Powers v. Railroad, 202 Mo. 280. (3) The speed of defendant's train which the evidence established to be from twenty-five to thirty-five miles per hour, being far in excess of the limit fixed by ordinance, was negligence *per se* on the part of defendant; this much being established, and the presumption of law which must be indulged in favor of the exercise of due and proper care on the part of deceased in approaching and attempting to cross defendant's track, made the case one for the jury, because it was a question of fact to be determined by the jury whether Laun was guilty of negligence in attempting to cross the track, in the light of all the facts and circumstances in evidence. Hutchison v. Railroad, 161 Mo. 246; Weller v. Railroad, 164 Mo. 198; Riska.v. Railroad, 180 Mo. 191; Eckhard v. Railroad, 190 Mo. 609; Powers v. Railroad, 202 Mo. 267. When there is a flagrant violation of a municipal ordinance resulting in an injury, contributory negligence must be clearly and satisfactorily made out before the court will relieve defendant on that ground. Petty v. Railroad, 88 Mo. 321; Bluedorn v. Railroad, 108 Mo. 449; Weller v.

Railroad, 120 Mo. 648; Bluedorn v. Railroad, 121 Mo. 268; Baker v. Railroad, 147 Mo. 166.  It is only when the evidence is substantially all one way, and no two opinions can be formed in the minds of fair-minded, reasonable, intelligent men that the court can determine the question of contributory negligence as a matter of law; but when reasonable and intelligent men might well differ as to the conclusions and inferences to be drawn from the evidence, such question is not one of law, but one of fact to be determined by the jury.  Kelly v. Railroad, 70 Mo. 608; Berry v. Railroad, 124 Mo. 244; Weller v. Railroad, 164 Mo. 205; Erickson v. Railroad, 171 Mo. 660; Meng v. Railroad, 108 Mo. App. 559; Campbell v. Railroad, 175 Mo. 175; Gibler v. Railroad, 203 Mo. 219.  The deceased cannot, as a matter of law, be convicted of contributory negligence if, when he reached the switch track, or the point between the switch track and the main track, and looked east for an approaching train coming directly toward him on a straight track, he could not tell as a matter of fact that the engine was approaching at a rate of speed far in excess of six miles per hour.  If in the position he was then in, its excessive speed was not then apparent to him, and we contend that as a well-known fact it could not have been apparent to him, because all he could see was the front end of the approaching engine, and if it was apparent that the train was then at such a distance from the crossing that an ordinarily prudent person, exercising due care, could safely cross the track in front of a train running six miles per hour without imminent danger, then deceased was justified in attempting to cross, relying on the presumption that defendant's agents and servants would obey the speed ordinance. Murray v. Railroad, 108 Mo. App. 508; Deitring v. Railroad, 109 Mo. App. 540; Eckhard v. Railroad, 190 Mo. 593; Heintz v. Railroad, 115 Mo. App. 671.

GRAVES, J.—Plaintiff, the widow of George Laun, deceased, brings action for the alleged wrongful killing of her husband by one of defendant's trains as it passed through the city of St. James in Phelps county, Missouri, June 14, 1904.

The negligence charged is (1) running in excess of the ordinance speed, *i. e.*, six miles per hour, (2) failure to ring the bell upon the approach of the street crossing where the accident occurred, and (3) carelessly and negligently running said train upon and against the deceased, after the employees knew or by the exercise of ordinary care might have known the perilous situation of deceased. In other words the last charge was an appropriate pleading of the humanitarian doctrine. In the instruction asked and given for the plaintiff the failure to ring the bell is abandoned, as is also the humanitarian doctrine, and the case is submitted solely upon the excessive rate of speed.

By change of venue the cause was sent from Crawford county, the place of its institution, to Gasconade county, where it was tried. By answer the defendant first invokes a general denial, and secondly an appropriate plea of contributory negligence.

Plaintiff introduced her evidence, to which the defendant demurred, which demurrer being overruled, the defendant declined to introduce any evidence, whereupon the jury was instructed and in regular course returned a verdict for the plaintiff in the sum of $5,000, which was followed by a judgment for such sum. Motion for new trial, timely made, proving futile, the defendant appealed.

The serious question in this case is the question of contributory negligence upon the part of the deceased. The negligence of the defendant in running in excess of ordinance speed is not denied. The rate is variously estimated at from twenty-five to thirty-

five miles per hour, and the latter is perhaps more nearly correct.

The accident occurred at the crossing of Jefferson street in the city of St. James. Defendant's railway runs practically east and west through said city, and Jefferson street runs north and south, so that they cross nearly at right angles. This crossing is one hundred to one hundred and twenty-five feet east of the depot of the defendant, and at the east end of the depot platform. The street is eighty feet in width and the one most generally used in going to and from the north and south parts of the city. Deceased left Miles's store, which is south of the railroad and on the west side of Jefferson street, evidently to cross to the north part of the city. In so doing he walked along the west side of Jefferson street and walked north. Between him and the east end of the depot platform was a side track and the main track of defendant's railway. The space between the two is given at twenty feet. In his course, he reached the switch track first and crossed it. On this occasion two trains came into St. James within a few minutes of each other—as best we can gather, within three minutes of each other. Both trains consisted of an engine and caboose. The station agent said that he did not signal a clearance to the latter train because it was following the other too closely, and he signalled it to stop, and that it finally stopped some six hundred or eight hundred feet beyond the depot, at the stockyards. This of course bears upon the rate of speed, and as indicated above, might tend to show a speed up to the limit placed by other witnesses of thirty-five miles per hour. But as the negligence of the company stands conceded, we are more concerned in the actions of the deceased, inasmuch as they must bear upon the question of contributory negligence. For the plaintiff there were seven witnesses, including herself. She did not see the acci-

dent, nor did F. R. Elliott, the station agent, nor C. F. Burge. Their testimony is not, therefore, directly valuable upon the question now in hand. The other witnesses upon this question testify thus:

H. H. Pinto says:

"Q. How long did you watch Mr. Laun? A. I watched him till he got across the street—or clear across the railroad, I mean, till he got to the main track.

"Q. What, if anything, did you see Mr. Laun do to ascertain if there was a train coming from the east? A. Why, nothing more than he looked when he got between the two; he crossed the side track before he got to the main track; he first glanced his head down the track, he looked east, the direction the train was coming.

"Q. Now, this track he crossed was a switch to the main line? A. Yes, sir; that is what I saw him cross.

"Q. He had crossed the street and crossed the switch track, and, as I understand you, he was between the main track and the switch track when he paused and looked east? A. Yes, sir."

On cross-examination, he further said:

"Q. You heard the train go through a minute before that and then you stepped out to see what it was? A. No, sir, I stepped to the door at leisure as I had nothing else to do at that time.

"Q. Well, the train was a block away then, in plain view and hearing? A. Yes, sir; it was.

"Q. Where was Mr. Laun then? A. He was right close to the side track; right close to the main track, I mean.

"Q. He crossed over on the side track? A. He crossed over to the side track and when he got half way between the side track and the main track he kind of paused and turned his head around.

"Q. He looked toward the engine? A. He looked that way.

"Q. And at the time the engine was right at him? A. It was not very long.

"Q. Well, it was right at him? A. It was back, I guess, forty or fifty feet.

"Q. And he started to run across, didn't he? A. Yes, sir.

"Q. He tried to beat it to the crossing—that is what he tried to do? A. I do not know.

"Q. That is the way it appeared to you, was it not; is not that a fact? He jumped like he would have to hurry to get across? A. Yes, sir; he would have to hurry of course to get out of danger.

"Q. When he stopped he was not in danger; he was between the two tracks? A. Yes, sir."

GEORGE STRATTMAN, a boy thirteen years old, who was on the depot platform, said:

"Q. Where was he when you first saw him [Laun]? A. He was right there at the switch coming across the track.

"Q. On which side of the main track is the switch? A. On the south side.

"Q. When you first saw him was he at the switch? A. He was out there coming across.

"Q. What was he doing? A. He was walking across there.

"Q. Did you see him as he got between the switch and the main line? A. Yes, sir.

"Q. After he had crossed over from the side track before he got to the main line? A. Yes, sir; I saw him then.

"Q. What did he do? A. He just looked east.

"Q. Was that the direction the train was coming from? A. Yes, sir; it was a west-bound train.

"Q. What did he do after he looked east? A. He came on across with his head down.

"Q. What happened then? A. He started to cross the other track and when he got a little ways he started to run; he got about middle ways of the main track and he started to run across; I do not know if it was the middle; he was about to that railing.

"Q. On the north or south side? A. On the south side.

"Q. And he started to run across? A. Yes, sir.

"Q. Did you see the train hit him? A. Yes, sir."

On cross-examination, he put it thus:

"Q. And you say you saw Mr. Laun coming from the south? A. Yes, sir.

"Q. Where was he when you first saw him? A. He was at that track.

"Q. Side track? A. I guess it is that switch track.

"Q. He came from that and before he got onto the main track he looked east? A. Yes, sir; he looked that way.

"Q. Where was the engine then? A. I did not see the engine until he got on the track.

"Q. When he got at the south rail, you saw him run? A. Just when he got to that rail he went to run across it.

"Q. He was across two rails when he looked east? A. He was between two tracks when I saw him look east.

"Q. When he got to the south rail he started to run? A. Yes, sir.

"Q. It got him before he could get across. A. He was about across when it hit him.

"Q. He was going on a run, was he? A. Yes, sir.

"Q. Hurrying across? A. Yes, sir."

WEST BARNES, who was on the depot platform, says:

"Q.   Where was Mr. Laun when you first saw him prior to the accident?   A.   He was between the side track and the main track.

"Q.   Did you see him as he came from Miles's store, on the south side of the railroad?   A.   No, sir.

"Q.   What was he doing when you saw him in between the two tracks?   A.   He was walking along.

"Q.   He was walking along?   A.   Yes, sir.

"Q.   What do you know of his looking for a train, east or west?   A.   I do not know.

"Q.   Where did you see him next?   A.   I saw him about the middle of the main track.

"Q.   What was he doing at that time?   A.   He was, I suppose, trying to get across the track.

"Q.   Was he standing still or walking?   A.   He was making a step.

"Q.   Making a step?   A.   Yes, sir.

"Q.   Where was the engine at that time?   A. Well, I never noticed particularly where it was; I never took any notice where it was; it was near."

On cross-examination, he further said:

"Q.   You say you saw this approaching train before you saw Mr. Laun?   A.   Yes, sir.

"Q.   How far away did you see the train—down to the section house?   A.   I saw it about three poles away.

"Q.   That far away before you noticed Mr. Laun? A.   Yes, sir.

"Q.   It was that many telegraph poles away before you saw Mr. Laun?   A.   Yes, sir; three poles away before I saw Mr. Laun.

"Q.   You could have seen the train past the section house, three quarters of a mile away, if you had looked, could you not?   A.   Yes, sir.

"Q. There was nothing to obstruct your view? A. I do not think there was anything on the line to obstruct my view.

"Q. Nothing in your way? A. Not that I know of.

"Q. It was a plain straight track all the way? A. Yes, sir.

"Q. You saw Mr. Laun between the two tracks, the side track and the main track, and what did he do? A. He looked and started ahead.

"Q. He stopped and looked ahead? A. He never made any stop. He looked ahead.

"Q. You did not say that he made a stop? A. No, sir.

"Q. You did not look away; you first saw him between the two tracks, and the next you saw him in the middle of the main track, is that right? A. Yes, sir; I kept watching him all the way from the time I first saw him.

"Q. Where was George Laun when you first saw him? A. He was about middle way between the side track and the main track.

"Q. About midway between the two tracks? A. Yes, sir.

"Q. You do not know if he had stopped and started up when you saw him? A. No, sir.

"Q. You do not know if he had looked before that or not? A. No, sir.

"Q. But the train was coming? A. Yes, sir.

"Q. You saw that it was coming fast? A. Yes, sir.

"Q. Going along very fast? A. Yes, sir; it was coming very fast.

"Q. It was plain to you that it was coming very fast? A. Yes, sir.

"Q. Faster than six miles per hour? A. I think so.

"Q. Fast as thirty miles per hour? A. Well, I would say twenty-five or thirty miles an hour.

"Q. That was all very apparent to you? A. Yes, sir.

"Q. You saw him when he went on the track in front of the train and about to be run down? A. Yes, sir.

"Q. When he went on the track he got immediately in front of the engine? A. Yes, sir.

"Q. So close he could hardly begin to get across? A. Yes, sir.

"Q. It was apparent to you that he would be struck, even from where you were standing and looking? A. Yes, sir.

"Q. It was perfectly plain? A. I saw there was no other show for him."

J. M. ASHER said:

"Q. Did you see Mr. Laun as he approached the track? A. Yes, sir; I saw him just about the time he got on the track.

"Q. About the time he got on the track? A. Yes, sir.

"Q. On the switch or main line? A. Yes, sir; I first saw him when he got off the switch and was between the switch and the main line.

"Q. And from that time on, what did he do? A. Well, the first I could see he was coming towards me; he was coming across the track, and just about the time he got on the main track—about that time he got one foot across the rail, he turned and looked and saw the train coming.

"Q. As he had one foot across the north rail? A. He had one foot across the rail and he turned his head and saw the train was coming and he began to make a leap to get across.

"Q. Well, where was he when he was struck? A. He was just about across the track and the corner

of the engine struck him about the hip here some-where.

"Q. You saw the train before that? A. Yes, sir.

"Q. Where did you first see the train? A. It was just coming in sight when I first saw it. . . .

"Q. How far east from the crossing was the engine when you first saw Mr. Laun? A. Well, I guess it was about twenty-five to forty yards from the crossing when I first saw Mr. Laun.

"Q. The engine was that far away when you first saw Mr. Laun? A. Yes, sir.

"Q. How far east from the crossing—well—you say that when you first saw Mr. Laun he was between the main line and the side track? A. Yes, sir."

And on cross-examination, he further said:

"Q. Did you notice the approaching train before you first saw Mr. Laun? A. Yes, sir.

"Q. Did you hear it? A. Yes, sir.

"Q. You heard it coming? A. I heard it whistle way down the track, and I heard it whistle as it come in sight.

"Q. Was the bell ringing? A. If there was 1 did not notice it.

"Q. As a matter of fact you did not pay any attention and they may have rung the bell? A. I do not think they rang any bell at all. . . .

"Q. You were just a little east of Jefferson street? A. Yes, sir.

"Q. So the train must have been by Jefferson street when you saw him? A. It was thirty or forty feet from the crossing or where he was crossing.

"Q. He was half way between the two tracks? A. I think he was pretty near the main track when I saw it.

"Q. He was between the two? A. He had crossed the switch and was going on the main track.

"Q. You saw him there? A. Yes, sir.

"Q.  You say then he stopped at the rail?  A. He didn't particularly stop; he simply turned his head and began to make his leap to get across.

"Q.  He was then at the south rail?  A.  Yes, sir.

"Q.  Did he go on the track?  A.  Well, I do not know if he was across or right at the south rail.

"Q.  He could have stepped back one step and been in the clear, is that right?  A.  I expect he could.

"Q.  He started across with a jump?  A.  Yes, sir; when he looked he saw the train and he began to make his leap; he was on the track when he saw the train.

"Q.  You do not know if he stopped between the tracks before that or not?  A.  Well, I did not notice that; I did not notice the train until it was nearly opposite me and he was coming across.

"Q.  How fast was the train running?  A.  It was about thirty miles per hour; it was so fast you could hardly tell the wheels were turning. . . .

"Q.  Then you saw him look toward the train? A.  Yes, sir.

"Q.  You do not know if he had paused before that and looked or not, do you?  A.  I do not know; he did not stop then, he just turned his head."

It appears that all the witnesses saw and knew the excessive rate of speed.    Giving the plaintiff the most favorable evidence the train was in plain view upon a straight, unobstructed track for at least a quarter of a mile to the east, and one witness fixes it at three-fourths of a mile.    The evidence also shows that deceased was about at the north rail of the main track when he was struck.    These excerpts and this summary fairly states the case on the question of contributory negligence.    The evidence tended to show that no bell was rung, but this, as previously said, was abandoned in the instructions.

216 Sup—37

I. Plaintiff's evidence is divisible into two classes, i. e., some witnesses say that deceased did not look until he got on the main track, or at least their language might by a strained construction be so construed, whilst others say he stopped and looked east, while he was between the two tracks. Grant it that deceased did not look for an approaching train until he was in fact upon the main track, what is the status of the plaintiff's case? If deceased failed to look and listen for an approaching train then he was guilty of negligence which would bar plaintiff's recovery, although the defendant was at the time guilty of negligence in running in excess of ordinance speed. Such has always been the rule in this State. In Schmidt v. Railroad, 191 Mo. l. c. 228-9, we said:

"The pivotal point upon which this case must turn is, did the circuit court err in overruling the demurrer to the evidence? That the train was running in excess of the rate of speed prescribed by the ordinance of Jefferson City is conceded and established by the testimony of the defendant's own engineer and fireman, as well as that of the plaintiff's witnesses. Such conduct on the part of the railway company was negligence *per se,* but notwithstanding this neglect of the regulations in regard to the running of trains within the city limits on the part of the railroad employees, the question still remains, was not the deceased's own contributory negligence the proximate cause of his death?'

"It is a settled law of this State that a person who goes upon a railroad track or proposes to cross it, must use his eyes and ears to avoid injury. And while a neglect of the regulations in regard to the running of trains amounts to negligence in law on the part of the railway company, this does not absolve pedestrians and others who propose to cross the tracks from the exercise of ordinary care. Every intelligent person who has arrived at years of discretion is pre-

sumed to know that it is dangerous to be upon a railroad track when trains are passing to and fro, and when crossing one, he is expected to be vigilant and watchful of the approach of the locomotive. The failure to exercise such vigilance is negligence *per se*. [Harlan v. Railroad, 64 Mo. 482.]

"The law that a traveller, before entering upon a railroad track, must observe some caution for his own safety, and that a failure to do so will be such negligence as will preclude a recovery in case of injury, is as well settled in this State as is the law that a railroad company is guilty of negligence in running a train without observing the reasonable precaution required by law or ordinance. The measure of precaution to be observed by a traveller depends often upon the circumstances and surroundings. The general rule is that in knowingly approaching the track of a railroad, he must use his sense of sight or hearing to ascertain if there be danger. If the view is so obstructed that he cannot see, he should carefully listen. The circumstances may not require that he both look and listen, but common prudence requires that he do either one or the other, and a failure to do so renders his act negligence in law. The rule of contributory negligence is not changed or abrogated by reason of a statute or ordinance imposing the duty on account of the violation of which the injury resulted. [Weller v. Railroad, 120 Mo. 653.] The statute does not absolve persons approaching a public railway crossing from exercising common prudence to avoid danger, nor shift the responsibility to another should injury ensue from the failure to exercise it. [Kenney v. Railroad, 105 Mo. 284.]"

To the same effect are the recent cases of Holland v. Railroad, 210 Mo. 338, and Stotler v. Railroad, 204 Mo. 619, in each of which the many supporting cases are cited and reviewed.

In the case at bar, had deceased looked he could have seen this train for at least a quarter of a mile, and coming upon a straight and unobstructed track. All of the witnesses did see it and they were in no better position to see than was deceased.

A railroad track of and within itself is a signal of danger, and one cannot carelessly attempt to cross the same without using some care for his own protection. The amount of care may be somewhat different under different surroundings, but he must at least exercise the senses with which he is endowed for his own protection, or at least some of them. Under all the evidence in this case to look was to see and to listen was to hear.

If then deceased did neither until he got on the main track, his contributory negligence must bar the plaintiff's action.

II. On the other hand, the weight of the evidence shows that he did look to the east just before reaching the main track, and then hurried across it in front of the rapidly moving train. Every witness who saw this train recognized the rapid speed thereof. What these witnesses could see and hear, deceased could have seen and heard. It will not do to say, as argued by counsel, that he perhaps thought the train was running only six miles per hour and he could, by hurrying, as he did hurry, cross in safety. He had no right to race with death that way. If he saw the train, and the evidence shows that he did, he knew that it was running more than six miles per hour. Every person there and testifying knew the speed, why not deceased? It is preposterous to say that an intelligent person could look at a train approaching at the rate of thirty to thirty-five miles per hour, without knowing that such train had a rapid rate of speed. To our mind the testimony shows that the deceased saw this train before he reached the main track, but

took his chances, thinking he could beat it across the crossing. In the case of Holland v. Railroad, 210 Mo. l. c. 351, a statement is made which aptly fits this case. We there said: "There is no escaping the conclusion that the deceased saw the approaching train. He must, therefore, have been absorbed in other matters, or have misjudged the speed of the train and determined to take the risk of being caught by it before he could cross the track. But, whatever may have induced his action, his conduct can only be characterized as the grossest recklessness. The demurrer interposed by the defendant to the evidence should have been sustained."

To further quote from or review authorities would be but to repeat. In the cases cited above, many of our own cases are cited and reviewed. To permit this verdict to stand would be but to wipe out the doctrine of contributory negligence, and that, too, in a case wherein there is no room for the humanitarian rule. This we do not feel called upon to do at this late date. Plaintiff's evidence disclosed such contributory negligence upon the part of deceased as to preclude her recovery. Defendant's instruction in the nature of a demurrer should have been given. For these reasons this cause should be and is reversed.

All concur.