BY THE

ST. LOUIS, KANSAS CITY AND SPRINGFIELD.

# COURTS OF APPEALS

AT THE

OCTOBER TERM, 1913.

JOHN BURNHAM, Administrator of the Estate of ALEXANDER BISWELL, Deceased, Respondent, v. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY and HARRY CRANCE, Defendants; CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, Appellant.

Kansas City Court of Appeals, November 17, 1913.

1. NEGLIGENCE: Contributory Negligence: Railroads: Boarding Trains. The administrator of the estate of Alexander Biswell, deceased, sued the defendant railroad company and one of its engineers to recover damages caused by the negligence of the defendants in the operation of a train. As the deceased was proceeding to board another train standing in the yards for the purpose of becoming a passenger thereon, he was struck and killed by a passing train of which defendant Crance was the engineer. *Held*, that the demurrer to the evidence should have been sustained.

2. ———: ———: Crossing Railroad Tracks. A person in the act of crossing a railroad track must before entering on it look and listen. If he does not and is injured in crossing he is guilty of contributory negligence.

· 175 Mo. App.]                    (286)

Burnham v. Railroad.

3. ——————: ——————: ——————: **Look and Listen.** A person travel-
ing on the highway is not guilty of contributory negligence
because of a failure to look and listen when the surroundings
are such that he cannot see or hear an approaching train.

4. ——————: ——————: ——————. When the view of the railroad
is obstructed so as to render it difficult or impossible to see
an approaching train, the question whether the traveler was
wanting in due care is one for the jury to determine, and it
is also a question for the jury under complicated circumstances
calculated to deceive and throw the traveler off his guard.

Appeal from Macon Circuit Court.—*Hon. Nat M.
Shelton,* Judge.

REVERSED.

*O. M. Spencer, Guthrie & Franklin* and *M. G. Rob-
erts* for appellant.

*Ed. S. Jones* and *Geo. N. Davis* for respondent.

JOHNSON, J.—The administrator of the estate of
Alexander Biswell, deceased, sued the defendant rail-
road company and Harry Crance to recover damages
on the ground that the death of Biswell was caused
by negligence of the defendants in the operation of a
train in the yards of the defendant company at Bevier.
As Biswell was proceeding to board another train
standing in the yards, for the purpose of becoming a
passenger thereon, he was struck and killed by a pass-
ing train of which Crance was the engineer.

The petition alleges, in substance, that Biswell was
at the place where he was struck on the implied invita-
tion of defendant company and that his death was
caused by one or more of the following acts of negli-
gence, viz., failing to give warning of the approach of
the train; running at excessive speed in violation of a
city ordinance (the place was within the corporate
limits of Bevier); running the train with loaded coal
car in front of the locomotive and a negligent breach

of duty under the humanitarian rule. Defendants answered separately denying the allegations of the petition and pleading contributory negligence.

Defendants offered no evidence at the trial. They demurred to the evidence of plaintiff but the demurrers were overruled and the issues of negligence raised in the petition were submitted to the jury as issues of fact. The jury returned a verdict for plaintiff against the defendant company but made no finding as to the individual defendant. After verdict the court, over the objection of the company, allowed plaintiff to dismiss the individual defendant from the action. Motions for a new trial and in arrest of judgment, filed in due time by the remaining defendant, were overruled and defendant appealed.

The evidence of plaintiff discloses the following facts: Bevier is a station on defendant's main line in the heart of a coal mining district and is the northern terminus of a short railroad operated by the Missouri & Louisiana Railroad Company from Bevier to certain mines and mining towns in the district. This railroad to which we shall refer as the M. & L. does a large passenger and freight business and is a feeder of defendant's railroad, with which it connects at Bevier. Its tracks, depot, water tank and other terminal properties are on defendant's right of way in close proximity to defendant's tracks which run east and west. The depot is a quarter of a mile west of defendant's depot and is a small, incommodious shanty. Most of the patrons of the road wait out of doors for trains in preference to crowding into the depot. The main track of the M. & L. road is eleven feet north of the depot and seven feet six inches south of defendant's main track to which it runs parallel for a distance of a quarter of a mile west of the depot. The M. & L. water tank is about sixty feet west of the depot and on the south side of the main track. The tracks and buildings are on an embankment and the situation

of the M. & L. depot is such as to render it almost inaccessible by any other way than that offered by the railroad yards. The main part of the town lies southeast of the depot and practically all of the pedestrian travel between the two places is on and alongside defendant's tracks between the two depots. Such use had been so general, continuous and notorious that defendant must be deemed to have had knowledge of it and to have approved it. Trains on the M. & L. road usually included an ordinary passenger coach and two or three box cars for miners to ride in. These rude passenger vehicles had steps on both sides and passengers were in the habit of boarding and alighting from trains on each side. The evidence tends to show that defendant had actual knowledge of this custom and knew that persons going to and from M. & L. trains were likely to be found using its main track as a passageway.

Biswell went to the M. & L. depot intending to become a passenger on an outbound train scheduled to leave at 4:30 p. m. The day was cloudy and rainy and he stood in the shelter of the water tank with two other passengers waiting for the train to be made up. When it pulled into the depot its locomotive which was in front of the train but was running backward, i. e., with the tender in front, stopped at a point between the depot and the tank. Biswell walked a short distance east on the south side of the track and then turned northeast and crossed the track just in front of the tender, evidently intending to board the train on the north side. He pursued a northeast course until he stepped on defendant's main track. A westbound local freight train pushing a loaded coal car in front of the locomotive was coming on that track and was so close to Biswell when he stepped on the track that he could not escape being struck. Apparently at that instant he first became aware of his peril and attempted

175 Mo. App. 19

to jump over to the north side of the track but was caught by the train, knocked down and killed. The two men who were standing with Biswell at the water tank were eyewitnesses to the accident. One of them testified that the tender of the M. & L. engine was about six feet west of the depot; that the train consisted of a locomotive, two box cars for passengers, and a coach; that Biswell went east from the tank a short distance, turned north, crossed the M. & L. track in front of the tender and passed over to defendant's main track; that witness heard the noise of the approaching train, heard the bell ringing and stepped around the tender to see the advancing train; that it was twenty to fifty feet east of a point opposite the west end of the tender and was approaching at five or six miles per hour; that it had a coal car in front of the engine, that no brakeman was on that car to look ahead for danger and that witness, perceiving the peril of Biswell, shouted a warning which came too late to enable him to escape being run down. The other eyewitness testified: "He walked over and just as he got into the main line I seen this other train coming up. The Louisiana, when it run by—as soon as I saw it run by the Louisiana (train) it hit him and kept knocking him. He kept taking long steps. It knocked him something like a rail length and a half. Q. From the time it first hit him? A. Yes, sir. Q. After it knocked him about a rail length and a half what happened? A. It knocked him down to the side of the north rail and run over him. From where I was I could see him under the train."

On cross-examination: "Q. He was on the south side of the M. & L. track was he? A. Yes, sir, when I first saw him. Q. He could have gotten on this train from the south side? A. Yes, sir. Q. Without stepping on the C. B. & Q. main track? A. Yes, sir. Q. Without stepping on any railroad track? A. Yes, sir, he could have gotten on if he wanted to. Q. Of course,

when the accident was on you were a little bit excited? A. Yes, sir, I was. Q. You don't know whether the bell was ringing or not? A. No, sir, I could not say. Q. I mean on the C. B. & Q. engine? A. No, sir, I would not say. Q. You would not say whether it was or not? A. No, sir, I would not say. Q. You would not say whether it was or was not? A. No, sir, I would not say it was, or was not. This other engine might have been ringing its bell, too. Q. You didn't pay any attention to it? A. No, sir, I was not looking for any accident. I didn't notice that. I didn't pay attention to that. Q. It all happened very quickly? A. Yes, sir. Q. It was just a matter of a few seconds, was it not? A. Yes, sir, it was only a few seconds. Q. Now, Mr. Canada, Mr. Biswell was on the south side of the M. & L. track? A. Yes, sir, he was on the south side. Q. Then he crossed behind this engine? A. Yes, sir. Q. Over to the C. B. & Q. track? A. Yes, sir. Q. And he was struck almost immediately? A. Yes, sir, it looked to me like the train was right on him when he walked over there. Q. Just as soon as he got on the track the train struck him? A. It looked to me like they was on him about the time he got there. Q. It was just an instant from the time he stepped on the track until the engine struck—until the car struck him? A. That is the way I saw it. Q. That is what I mean. It was instantly, it seemed to you? A. Yes, sir. Q. Now, when the man stepped around behind that M. & L. engine, if he had looked east he could have seen the train coming, could he not? A. Yes, sir, I believe he could. Q. It was daylight then? A. Yes, sir, it was daylight. Q. You saw it coming? A. I saw it before it hit him—just a little before it hit him. Q. You were standing behind the tank? A. I was right at the tank. Q. Then you were not exactly west; you were a little bit southwest of Biswell? A. Yes, sir, it would be southwest of Biswell. Q. And then you saw the train, though you were further away? A. Yes, sir, I saw

it just as it came by the Louisiana (depot).  I saw it.''

.    .    .    .    .    .    .    .

''Q.  Then he was instantly hit as soon as he
stepped on the C. B. & Q. track?  A. It looked like he
walked on over there and the train was on him just as
he crossed over.  Q.  He was instantly hit?  A.  It
looked like it, only it didn't get him down right there.
Q. You saw him?  You were one of the eyewitnesses of
the accident, were you?  A.  I saw him before he was
hit.  Q.  You were an eyewitness to the accident?  A.
Yes, sir, I saw him before he was hit.  Q.  Now, when
he was first struck how far west of the depot was he?
I mean how far west of the M. & L. depot was he?
A. I believe he would be, maybe possibly, about ten or
twelve feet.  Q.  Ten or twelve·feet?  A.  That is what
I believe now, to the best of my knowledge.''

.    .    .    .    .    .    .    .

''Q.  When the train hit him how close was he to
the north rail?  A.  A foot or a foot and a half of the
north rail.  He would be past the drawbar.''

The evidence that the bell of the engine was not
ringing is very weak, as is also the evidence that the
train was moving in excess of six miles per hour, the
limit fixed by an ordinance of the city in evidence, but
for the purposes of our discussion of the demurrer to
the evidence we shall concede for argument that there
is some substantial evidence in the record tending to
show that the bell was not rung and that the train
was running at from eight to ten miles per hour.  De-
fendant's main track curves very slightly towards the
south and it was impossible for the engineer who was
on the north side of the cab to see Biswell when he
stepped from behind the tender of the M. & L. engine.
The fireman was shoveling coal and was not looking
ahead.

The facts and circumstances which we shall regard
as proved in our consideration of the demurrer to the
evidence, together with the reasonable inferences that

may be deduced from them in aid of plaintiff's position, convict defendant of negligence in blindly running its train into a place where it had reason to anticipate the presence of persons on the track whose safety would be menaced by such negligent operation. The negligence of defendant is so apparent we shall not pause to discuss it, but shall pass on to the issue of contributory negligence.

We do not agree with defendant that Biswell should be held to have been negligent in law for attempting to board the M. & L. train on the north side instead of on the south side. He had before him an open and safe pathway along the south side, but in view of the very common practice of passengers to board trains from both sides, we think the issue of care raised by his act in following a general custom, of which defendant had knowledge, should be treated as involving an issue of fact for the jury to solve.

The conduct of the deceased after he emerged from behind the tender presents a far more serious question. At that moment he was in a place of safety and the approaching coal car could not have been more than forty feet away even if it were moving at ten miles per hour. It was in broad daylight, the deceased was in full possession of the unimpaired senses of sight and hearing and he could not have failed to see and hear the train had he looked and listened. Every witness in the vicinity saw and heard it and the action of the deceased in going on the track directly in front of the coal car cannot be accounted for on any hypothesis that will excuse him from the imputation of negligence.

As is said by the Supreme Court in Dyrcz v. Railroad, 238 Mo. l. c. 46: "In the law of negligence a railroad track in and of itself is an unequivocal and large sign of danger. It stands there mutely but unmistakably crying aloud, 'Danger!' It is much the

same as if one stood there and with a trumpet called out, 'Beware!' 'Look out for the cars!' 'Listen for the cars!' 'Look out for yourself!' 'Look well to what you are about to do for you are taking your life in your hands!' 'Use your eyes!' 'Use your ears!' 'Use your common sense!' Accordingly, as a general rule, in the administration of justice in this kind of case, a person in the act of crossing such track must before entering on it look and listen. If he does not and is injured in crossing he is guilty of negligence, he contributes to his own injury and is hurt by his own fault. In such case, the best the law can do is to leave him where he puts himself; for no action lies. Moreover, given daylight and no obstructions, given a situation where to look is to see, then such person is conclusively held to see; for on that hypothesis looking is equivalent to seeing. Hence, for one to say (as plaintiff does) that he did not see an engine bearing down upon him and so close to him as to strike him as he crossed the track, is precisely the same as if he had said he did not look at all. No judgment should stand on an impossibility; for example, on the fact that one saw around a corner with a naked eye, or through a solid stone wall, or in broad day looked and did not see a locomotive engine hard by on a straight and unobstructed track.''

Counsel for plaintiff endeavor to bring the case within the scope of the rule thus stated by Judge BLACK in Baker v. Railway, 122 Mo. l. c. 544: ''But the rule before stated is not so unyielding that it must be applied in all of its rigor under all circumstances. It is well settled that the person traveling on the highway is not guilty of contributory negligence because of a failure to look and listen when the surroundings are such that he cannot see or hear an approaching train. [Johnson v. Railroad, 77 Mo. 546; Donohue v. Railroad, supra; Kenney v. Railroad, 105 Mo. 270; Petty v. Railroad, 88 Mo. 306.] Though the circum-

stances are such as to render looking and listening of no avail, it is still the duty of the traveler to use care and caution. But, when the view of the railroad is obstructed so as to render it difficult or impossible to see an approaching train, the question whether the traveler was wanting in due care is one for the jury to determine; and it is also a question for the jury under complicated circumstances calculated to deceive and throw the traveler off his guard. [Beach on Cont. Neg. (2 Ed.), sec. 195.]''

But that rule cannot aid plaintiff since it undisputably appears that while he was in a place of safety Biswell was where no obstacle intervened to prevent him from seeing and hearing the advancing train that made it perilous for him to attempt to go on the track. His duty to look and listen was a continuing duty. After he had passed from behind the tender he took two or three steps before he reached the path of danger. Obviously he took them blindly and heedlessly, or recklessly. In either case he was guilty of negligence that will preclude a recovery by plaintiff unless it could be said that the issue of last chance negligence raised by the petition finds support in the evidence. Since Biswell stepped on the track from a place of safety when the train was upon him, we perceive no ground upon which a reasonable inference may rest that the operators of the train saw or should have seen his peril in time to have saved him by the exercise of reasonable care. The peril arose and the lethal blow was struck within a brief moment—not to exceed two seconds—and it is impossible to conceive of anything effective that could have been done in the reasonable discharge of defendant's humanitarian duty. The case falls within the purview of the rule thus stated in Dyrcz v. Railroad, supra:

''Under the doctrine of many cases plaintiff's own testimony put him in the fix of a man who negligently moves from a place of safety beside the track to a place

of danger from a going locomotive on a track, and immediately before it. In that view of it there is no room to apply the last clear chance or humanity rule. *Contra* plaintiff's negligence is the proximate cause of his injury. [Green v. Railroad, 192 Mo. 131; Schmidt v. Railroad, 191 Mo. 215; Mockowik v. Railroad, 196 Mo. l. c. 570; Eppstein v. Railroad, 196 Mo. l. c. 733; Stotler v. Railroad, 204 Mo. 619; Laun v. Railroad, 216 Mo. 563.]''

The demurrer to the evidence should have been given. Judgment reversed.

All concur.