J. L. Jones, *Appellant*, v. The Atchison, Topeka & Santa Fe Railway Company, *Appellee*.

No. 17,002.

SYLLABUS BY THE COURT.

Contributory Negligence — *Demurrer to Evidence Properly Sustained.* A railroad crossing in a city was required by ordinance to be guarded by gates let down when cars were passing. One of the gates was out of repair, but plaintiff, who drove up from the east in a buggy with back and side curtains down, saw that the other gate was down at the farther side of the crossing, and it indicated to him that a train was likely to be passing at any time. He was familiar with the crossing and knew that he could not see a train approaching from the south until his horse reached the east switch track, but after halting or stopping, and looking, twelve feet back, he proceeded in a "sort of jog trot" until his horse reached the track, when it was frightened by a freight car backed from the south, and plaintiff was injured. No signal or warning save the west gate was seen or heard by him until just as he saw the car, when some one exclaimed "Look out!" He testified that he was going to cross the switch track and then he could go north or south (before reaching the main track), to another street. That he could either have done that or "stayed in there until they passed." That he made up his mind to take that chance at his own hazard and risk before he received any injury at all. *Held*, that the trial court properly sustained a demurrer to plaintiff's evidence.

Appeal from Osage district court. Opinion filed July 7, 1911. Affirmed.

*A. B. Crum,* and *J. P. McLaughlin,* for the appellant.
*William R. Smith, O. J. Wood,* and *Alfred A. Scott,* for the appellee.

The opinion of the court was delivered by

WEST, J.: The appellant, J. L. Jones, sued the railway company for damages caused by its alleged negligence in frightening a horse driven by him, resulting in throwing him from the buggy in which he was riding and so injuring his leg that amputation became necessary. At the close of his evidence the trial court sustained a demurrer thereto, and this is the principal error assigned.

Where the railroad crosses Market street between Fifth and Sixth streets in Osage City there is the passing track, eight or ten feet east of which is the main track, and about thirty or forty feet east of the main track are two switch tracks about eight feet apart and converging at the south side of Market street, where there is a pony switch. Market street is about eighty feet wide, sixty-five or seventy feet between the curbs, and runs east and west across the tracks which run northeast and southwest. At the north of the crossing on the east side is a one-story brick building within three or four feet of the east switch track, and at the south side a two-story building known as the Hershey building within three or four feet of the east track, and east of this building up to the next corner are other buildings one and two stories high, so that a person approaching the crossing from the east can not see a train approaching from the south on the east track until he comes past the corner of the Hershey building, and if driving he could not see past the Hershey building until the horse had reached

the east track.   The railway company maintained gates at the crossing on either side of its tracks, eighty to one hundred feet apart, worked by one device operated by a watchman.   Such gates were required by a city ordinance to be down whenever cars were passing.   The east gate, ten or twelve feet from the east track, had at the time of the injury been out of repair about two days, of which fact Jones testified he was not advised. On the day in question Jones was driving back to the livery stable west of·the tracks on Fifth street, where he worked, a horse and buggy which had been delivered to an office east and north of the crossing.   It was a clear windy day, the wind blowing from the south or southwest.   The watchman was standing at the west gate leaning over the gate stand, the west gate being down.   No signal or warning aside from the west gate was seen or heard by Jones, and as he reached the east switch track a box car backed north by an engine frightened the horse, the injury resulting.   The horse was gentle and used to the town and crossings.   The side and back curtains of the buggy were down.   Jones approached the crossing in a sort of jog trot and stopped or halted when he reached the location of the east gate and looked out, and seeing no train proceeded until his horse reached the east track, when someone exclaimed "Look out!" and the car came north at a speed variously estimated by the witnesses from four to ten miles per hour.   When about one hundred feet from the crossing he looked and saw that the west gate was down, which indicated to him "that he wanted to look out and that a train was coming along."   He was entirely familiar with the crossing and had been for a number of years, and was quite familiar with the times of the trains there and knew that the buildings mentioned obstructed the view as already indicated.

William Sherry testified that he was driving west on Market street and stopped when he got close to the crossing or within about forty feet of the east

gate near the north side of the street; that he saw Jones slow his mare down when he got near the gate and then start on and drive up very close to the track; that just as he got up on the track the car came from the south; that a man would have to get as near the track as Jones was before the car could be seen by one driving in the center of the street; that witness saw that the west gate was down when he stopped forty feet east of the east gate; could not say whether after Jones stopped the horse walked or continued to trot until reaching the track; that at the same instant the witness saw the car he heard an outcry.

Holly McClancy, a hack driver, was standing at the Santa Fe depot and when he first observed Jones the latter was about ten feet east of the gates; had his head out looking to the north; at that time witness saw a freight train backing in from the southwest; that Jones drove up about fifteen feet, to the rail, and there discovered the train and began to back his horse; when his horse reached the east rail of the track the train was between the three-cornered building and the middle of the street, Jones being about thirty feet north of the building; that when his horse hit the east rail about one-half the length of the car had passed the three-cornered building coming to the north; that the horse was in a little jog of a trot; that the gate man lets the west gate down upon the approach of a train upon the main line.

Albert Goodsell testified that he heard someone cry out and looked up and Jones' horse was on the track and the car was coming out by the three-cornered building pretty near a car length from him; that a horse would have to be on the track in order for a person driving a buggy to see any cars south of the building on the switch track; that witness' father stopped with his dray wagon before the crossing and called out to Jones. His father was right at the edge of the track between it and the gate.

Clarence Goodsell testified that he was passed by Jones who as he came pretty near past stuck his head out and kind of slowed up, then went on; the front feet of Jones' horse were at the east rail of the track when witness first saw the car; the horse would have to be right at the track for the person in the buggy to see a car from the south; witness heard no one cry out but himself; was about thirty feet from the switch when Jones passed him; witness stopped because he saw the corner of the car coming around the corner of the building; he also saw the west gate down; also saw a brakeman motioning the car to back; he, the brakeman, was right west of the three-cornered building and west of the car; Jones could not see him from where he was; on the south side of the street the closer one is to the building the more his sight is shut off; Jones, when he passed, was six or eight feet further south than witness.

Jones himself testified that when within twelve or fifteen feet of the east gate he stopped the horse and looked out both ways and could not see anything in the way and started the horse up in a little jog of a trot. He saw that the gates were up; that after he started his horse toward the east rail he was driving to the barn; was going to cross the track to the barn; that there was nothing to obstruct his view only he saw that the west gate was down. The west gate was down when he was about one hundred feet from the east gate. This indicated to him that a train was going to come along there sometime soon; meant that he wanted to look out and that a train was coming along. When he stopped and looked his view was completely obstructed by the three-cornered building on the south. He could not see farther than the building. This was the only time he stopped after he turned to go west. Some one exclaimed to him "Look out!" as he got to the side of the track.

"Ques. You were going to cross ahead of the box

car and go back on Fifth street and cross the switch and go to Main street? Ans. No, sir.

"Q. What were you going to do? A. I was going to cross this switch track and then I could go up Fifth street by turning south.

"Q. You mean turn south and cross the switch track? A. Yes, sir. I could either have done that or stayed in there until they passed.

"Q. It was not a safe place in there on the right of way of the company, was it? A. There was room in there between the two tracks.

"Q. You would be on the right of way of the company? A. Yes, sir.

"Q. And between the two tracks? A. Yes, sir.

"Q. You made up your mind to take that chance at your own hazard and risk before you received any injury at all? A. Yes, sir."

On redirect examination he was asked what he meant by this answer and said, "Well, my intention was to get across." There was an attempt on redirect examination to explain that he meant that the west gate indicated that a train might pass over the main track, and to assert a misunderstanding of the question about taking the hazard of crossing. But the quoted portions of his evidence are sufficiently self-explanatory to show their plain meaning.

It is argued that the negligence of the railway company placed him in a position of danger, and he had to choose whether to back away or advance and made the best choice he could. The question, however, is, Did his own negligence materially contribute in putting him in a place of danger? He was thoroughly familiar with the location, character and danger of the crossing, and knew that he could not see a train approaching from the south until he himself was past the corner of the Hershey building, and he knew that the west gate was down, which meant that he should look out for a train. With this knowledge he voluntarily proceeded, hoping to get across the tracks, or at least between the switch tracks and main track, before a train

should impede his progress. He was the only one of the persons headed west who thus proceeded. After his halt at the east gate he knew that as he advanced he was in constantly increasing danger and yet he proceeded, the vehicle closed except in front. Doubtless he told the exact truth when he said he intended to take the hazard and get across. It is said that if the east gate had been down the injury would not have occurred. On the other hand it is said that the condition of the west gate gave him equal warning. While this may not be entirely correct, still as the two gates were worked with one device he knew when he saw the watchman leaning over the gate stand where the west gate was down that the crossing was not open for the passage of vehicles.

Counsel suggest that even if Jones were negligent the railway company was guilty of negligence so gross and wanton that he is still entitled to recover. A sufficient answer to this is that the company is not charged with other than ordinary negligence.

Where one by his own want of care materially contributes to his own injury it is familiar and settled law that he can not hold the other party liable for like negligence, and where the undisputed facts are such as to show contributory negligence clearly, it then becomes a question of law to be determined by the court and not by the jury. (*U. P. Rly. Co. v. Adams*, 33 Kan. 427; *Clark v. Mo. Pac. Rly. Co.*, 35 Kan. 350; *W. & W. Rld. Co. v. Davis*, 37 Kan. 743; *A. T. & S. F. Rld. Co. v. Townsend*, 39 Kan. 115; *C. K. & W. Rld. Co. v. Fisher*, 49 Kan. 460; *Railroad Co. v. Holland*, 60 Kan. 209; *Railroad Co. v. Willey*, 60 Kan. 819; *Railway Co. v. Trahern*, 77 Kan. 803; *Beech v. Railway Co.*, ante, p. 90.)

Counsel have disregarded rule 9 of this court in respect to their abstract and we have been compelled to examine about 158 pages of transcript of evidence,.

but having done so with the result already indicated, we do not find any error· in the ruling of the trial court. The judgment is, therefore, affirmed.