ROSETTA KEELE v. ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, Appellant.

In Banc, May 20, 1914.

1. NEGLIGENCE: Omitting to Put Issue to Jury. Although the petition in the negligence case counted on defendant's failure to sound the whistle, as the statute required, yet if plaintiff's instruction did not put that issue to the jury, it fell out of the case, and must be considered abandoned.

2. ———: Child as Adult: Conceded in Plaintiff's Instruction. The trial theory abides for appellate purposes; so that, where plaintiff's given instruction specifically declared "deceased was negligent in approaching and going upon the track of the defendant upon which she was struck by a train," plaintiff thereby put her case to the jury upon the theory that decedent, though only fifteen years of age, was *sui juris*, and thereby removed from the case the vexed questions of the heedlessness, buoyancy, inadvertence, lapses and the daring of youth as elements in ascribing blame or fixing responsibility for the act.

3. ———: Going On Railroad Track at Crossing: Concurrent Negligence: Humanity Doctrine: No Danger Zone. One about to go upon a railroad crossing owes it to himself to stop and listen, and if he is guilty of negligence in going upon it and is injured by an on-coming train, even though those in charge of the train are negligent in not sounding the bell, as the statute requires, the concurrent negligence of the pedestrian and of the railroad bar a recovery for the injury, unless plaintiff's case is saved by the application of the humanitarian doctrine; but that doctrine does not apply where there is no danger zone; that is, the pedestrian must be or can be seen to be in peril in time to stop the train before striking him. The engineer seeing a person *sui juris* approaching the track on

foot in an ordinary walk may act on the presumption the person will stop before stepping thereon immediately in front of his engine.

4. ————: Humanity Doctrine: Oblivious to Danger: Holding Hat in Wind. The fact that the fifteen-year-old girl, admitted to have been negligent and therefore *sui juris*, was holding her hat rim down in a stiff wind, hard to face, because it carried sand and dust, blowing from the same direction from which the train was approaching, and had her head bent a little down and away from the train, did not indicate she was oblivious to danger or that she intended to attempt to cross the track in front of the approaching train or did not know of its approach.

5. ————: Kansas Law. The negligence law of Kansas, as expounded by her Supreme Court, is much the same as that of Missouri.

6. FORMER APPEAL: Decision of Court of Appeals: Res Adjudicata: Law of Case. While an opinion of a court of appeals on a former appeal in the same case is persuasive and is usually followed, yet where, after a retrial, the whole case is brought to the Supreme Court and no part of it left behind, such an opinion is not binding on the Supreme Court as either *res adjudicata* or the law of the case. In this case, the Kansas City Court of Appeals had held there was a case for the jury and remanded the cause for a new trial, and it is *held*, after another verdict for the plaintiff and another appeal, that defendant's demurrer to the evidence should have been sustained.

Appeal from Jackson Circuit Court.—*Hon. O. A. Lucas,* Judge.

Reversed.

*Thomas R. Morrow, Cyrus Crane, James P. Gilmore, John H. Lathrop* and *George J. Mersereau* for appellant.

(1) The accident and death resulting therefrom, having occurred in the State of Kansas, the laws of that State determine whether or not any cause of action existed for and on account of such death. Yost v. Railroad, 149 S. W. 577; Newlin v. Railroad, 222 Mo. 375; Root v. Railroad, 195 Mo. 345; McGinnis v. Car & Foundry Co., 174 Mo. 227; Fogarty v. Transfer Co., 180 Mo. 490; Chandler v. Railroad, 127 Mo. App. 34; Benedict v. Railroad, 104 Mo. App. 218; Wil-

liams v. Railroad, 106 Mo. App. 661. (2) Upon the entire record, under the decision of the Supreme Court of Kansas, the deceased was guilty of such negligence, or contributory negligence, that no recovery can be sustained in this case. Dyerson v. Railroad, 74 Kan. 528; Coleman v. Railroad, 123 Pac. 756; Dunlap v. Railroad, 123 Pac. 754; Marple v. Railroad, 85 Kan. 699; Beech v. Railroad, 85 Kan. 90; Jones v. Railroad, 85 Kan. 313; Railroad v. Townsend, 39 Kan. 115; Railroad v. Adams, 33 Kan. 427; Railroad v. Fisher, 49 Kan. 460; Railroad v. Priest, 50 Kan. 16; Young v. Railroad, 57 Kan. 144; Bush v. Railroad, 62 Kan. 709; Railroad v. Wheelbarger, 75 Kan. 811; Roach v. Railroad, 55 Kan. 654; Railroad v. Holland, 60 Kan. 209; Limb v. Railroad, 73 Kan. 220; Railroad v. Trahern, 77 Kan. 803; Railroad v. Hutchinson, 39 Kan. 485; Railroad v. Schwindt, 67 Kan. 8; Railroad v. McMinn, 72 Kan. 681; Zirkle v. Railroad, 67 Kan. 77; Railroad v. Bussye, 66 Kan. 735; Railroad v. Wheeler, 80 Kan. 187; Carey v. Railroad, 84 Kan. 274; Railroad v. Entsminger, 76 Kan. 746; O'Brien v. Loomis, 43 Mo. App. 29; Railroad v. Baker, 104 S. W. 1182; Greathouse v. Croan, 76 S. W. 273; Hollerson v. Railroad, 157 Mo. 216. (3) Also, upon the entire record, under the decisions of the Supreme Court and of the Courts of Appeals of Missouri, deceased was guilty of such negligence, or contributory negligence, that no recovery can be had in this case, irrespective of anything that is, or might be pleaded, and, while the decisions of the Supreme Court of Kansas fully deny a recovery, the opinion in this case on the former appeal ought to be overruled, and the law declared as it is and always has been, with the exception of such former erroneous opinion. Dycez v. Railroad, 238 Mo. 33; Laun v. Railroad, 216 Mo. 563; McGee v. Railroad, 214 Mo. 530; Stotler v. Railroad, 204 Mo. 619; Ries v. Transit Co., 179 Mo. 1; Petty v. Railroad, 179 Mo. 666; Lennon v. Railroad, 198 Mo. 514; Green v. Railroad, 192 Mo.

131; Schmidt v. Railroad, 191 Mo. 215; Markowitz v. Railroad, 186 Mo. 350; Mockowik v. Railroad, 196 Mo. 550; Wasmer v. Railroad, 148 S. W. 155; White v. Railroad, 159 Mo. App. 508; Haffey v. Railroad, 154 Mo. App. 493; Reardon v. Railroad, 114 Mo. 384; Caldwell v. Railroad, 58 Mo. App. 453; Sites v. Knott, 197 Mo. 684; Yancey v. Railroad, 93 Mo. 433; Boyd v. Railroad, 105 Mo. 371; Moore v. Railroad, 176 Mo. 528; Kelley v. Railroad, 75 Mo. 138; Harlan v. Railroad, 64 Mo. 480; Harlan v. Railroad, 65 Mo. 22; Reno v. Railroad, 180 Mo. 470; McCreery v. Railroad, 221 Mo. 18; Van Bach v. Railroad, 171 Mo. 338; Guyer v. Railroad, 174 Mo. 344; Butts v. Railroad, 98 Mo. 272; Watson v. Railroad, 133 Mo. 246; Penell v. Railroad, 153 Mo. App. 566; Hamilton v. Marks, 63 Mo. 172; Rutledge v. Railroad, 123 Mo. 121; Schaub v. Railroad, 133 Mo. App. 444; Duncan v. Railroad, 46 Mo. App. 199; Lien v. Railroad, 79 Mo. App. 475; Jones v. Railroad, 63 Mo. App. 501; Drake v. Railroad, 51 Mo. App. 562; Boring v. Railroad, 194 Mo. 541; Giardina v. Railroad, 185 Mo. 330; McGauley v. Transit Co., 179 Mo. 583; Peterson v. Railroad, 156 Mo. 552; Hayden v. Railroad, 124 Mo. 566; Kelsay v. Railroad, 129 Mo. 365; Lane v. Railroad, 132 Mo. 4; Sanguinette v. Railroad, 196 Mo. 466; Moody v. Railroad, 68 Mo. 670; Payne v. Railroad, 136 Mo. 562; Hook v. Railroad, 162 Mo. 567; Walker v. Railroad, 193 Mo. 453; Zimmerman v. Railroad, 71 Mo. 636; Henze v. Railroad, 71 Mo. 636; Purl v. Railroad, 72 Mo. 168; Turner v. Railroad, 74 Mo. 802; Hixon v. Railroad, 80 Mo. 335; Fox v. Railroad, 85 Mo. 679; Huggart v. Railroad, 134 Mo. 673; Porter v. Railroad, 199 Mo. 82; Higgins v. Railroad, 197 Mo. 300; Fletcher v. Railroad, 64 Mo. 484; Lenix v. Railroad, 76 Mo. 86; Stepp v. Railroad, 85 Mo. 229; Matz v. Railroad, 217 Mo. 275; McGrath v. Transit Co., 197 Mo. 97; Clancy v. Transit Co., 192 Mo. 615; Evans v. Railroad, 178 Mo. 504; Davis v. Rail-

road, 159 Mo. 1; Degonia v. Railroad, 224 Mo. 564; Hawkins v. Railroad, 135 Mo. App. 524; Tanner v. Railroad, 161 Mo. 497; King v. Railroad, 211 Mo. 1. (4) The doctrine of *stare decisis* or of *res judicata* will not apply in this case, as the testimony in the record is entirely different from that on the former appeal. Fuchs v. City, 167 Mo. 620; Kelly v. Thuey, 143 Mo. 422; Mfg. Co. v. Troll, 77 Mo. App. 339.

*Charles A. Stratton* and *Bird & Pope* for respondent.

(1) On this, the second appeal of this case, the law laid down in the first appeal governs on this, the second appeal. Palmer v. Reeves, 142 S. W. (K. C. Court App.) 1080; Parker-Washington Co. v. Transit Co., 147 S. W. (St. L. Court App.) 189. It has never been held that a ruling upon one state of facts is a conclusive adjudication of the law applicable to a state of facts essentially different from the former. Parker-Washington Co. v. Transit Co., 147 S. W. (St. L. Court App.) 189. But the second appeal in this case presents no such difference in the state of acts. (2) While the plaintiff pleaded the statutes of Kansas, and introduced them in evidence in support of her cause, the appellant now contends that the plaintiff is debarred of her recovery by the decision in the Dyerson case, 74 Kan. 524. This contention of the defendant is without merit, and is unsupported by either the Kansas or Missouri cases. Met. St. Ry. v. Arnold, 67 Kan. 260; Coasting Co. v. Tolson, 139 U. S. 551; Railroad v. Ives, 144 U. S. 408; Hurdle v. Railroad, 73 Kan. 769; Railroad v. Baker, 79 Kan. 183, 21 L. R. A. (N. S.) 247. Under the decisions of the Kansas court Dyerson could not recover unless he was in unconscious or helpless peril. Smith v. Railroad, 114 N. C. 728. And such is the law in this State. Shanks v. Traction Co., 101 Mo. App. 702; Kinlen v. Met. St. Ry. Co., 216 Mo. 145; Smith v. Railroad, 129 Mo. App.

413. This case was reversed by the Kansas City Court of Appeals solely because the trial court did not, by its instructions, require the jury to find, as a condition for a recovery, that the employees of the defendant should have seen Pearl Keele "was oblivious of her danger, and if not warned would place herself in the way of the train." But, even if it is necessary to show "wantonness" by the evidence, the facts disclosed by the record show wanton conduct on the part of the engineer and fireman. McNamara v. Met. St. Ry. Co., 133 Mo. App. 645; Zalotuchin v. Met. St. Ry. Co., 127 Mo. App. 572; Kellny v. Railroad, 101 Mo. 67; White v. Railroad, 202 Mo. 539; Johnson v. Railroad, 203 Mo. 381; Brown v. Knapp & Co., 213 Mo. 694. (3) There is no essential difference in the testimony.

LAMM, C. J.—The parents of Pearl E. Keele, a minor, sued the corporate defendant in the Jackson Circuit Court for her negligent death where a county road crossed defendant's track in Kansas. Presently the father dying, plaintiff, the mother, filed an amended petition and (over the answer of defendant taking issue thereon) was allowed to prosecute the action to a judgment in her sole name. She had a verdict for $5000. From a judgment following, defendant appealed to the Kansas City Court of Appeals. That court, being of opinion constitutional questions were involved, sent the case here, and (as we overruled a motion to retransfer it) here it is.

Questions are raised on constitutional law, on pleadings, on practice, on evidence, on instructions given for the plaintiff and refused to defendant. One of the latter hinges, on the sufficiency of the evidence to make a case, either under the law of negligence as administered in Kansas or in this State. That contention seeks the fact and trial issues thereon. If, under the grounds of recovery (relied on *pro*) and

the defense of contributory negligence (relied on *con*) there is no case on the facts, then the case breaks at that point and all other questions become unimportant. If there be a case on the facts, then other questions remain to be reached and disposed of in their order. Attend to the matter from the viewpoint of case or no case.

We omit pleadings. Let it be assumed that plaintiff's principal instruction was within the averments of the petition. It suggests the gravaman of the action, indicates the trial theory and reads in part, and so far as material, thus:

"The court instructs the jury that Pearl E. Keele, deceased, was negligent in approaching and going upon the track of the defendant upon which she was struck by a train of the defendant; still, if you further believe and find from the evidence that said Pearl E. Keele was approaching and going upon the track of the defendant upon which she was struck and into a position of peril of being struck by said train, and that she was unaware of and oblivious to such danger, and if you further believe and find from the evidence, that the engineer or fireman of said train, by keeping a vigilant lookout ahead of him, could, by the exercise of ordinary care, have discovered that said Pearl E. Keele, deceased, was approaching said track, and was going into a position of peril of being struck by said train, and that she was unaware of and oblivious of her danger, and that if she was not warned before she went on said track she would place herself in the way of said train, and if you further believe and find from the evidence that said engineer or fireman could, by the exercise of ordinary care have warned said Pearl E. Keele of the approach of said train by the whistle or bell of said engine before she went on said track, and could thereby, by the exercise of ordinary care, have avoided striking and injuring her, and negligently failed to give such warning of the

approach of said train; and if you further believe and
find from the evidence that if such warning by the
whistle or bell of said engine had been given said
Pearl E. Keele, deceased, she would not have been
been struck and injured by said train, you will find
for the plaintiff. And you are further instructed that,
in the absence of evidence or circumstances to the
contrary, you may assume that if such warning by the
whistle or bell of said engine had been given said Pearl
E. Keele, deceased, she would have heard it. And,''
etc.

There was a bundle of specifications of negli-
gence in the petition, besides those set forth in the
instruction, but all of them fell out of the case except
(1) absence of ordinary care in failing to keep an
outlook, and (2) failing to warn decedent by bell or
whistle as she was going on the track oblivious to her
own danger.

There was, as said, a plea of contributory negli-
gence. With that instruction, and the pleadings as
indicated, kept in mind, attend to the facts.

At six thirty in the afternoon of a day in May,
1906, whilst yet full day, Pearl E. Keele (on foot from
the north) walked to the south on a north-and-south
public road in Wyandotte county, Kansas. That road
crossed at right angles a cluster of, say, fifteen tracks
in defendant's yard in the country, west of the limits
of a town called Argentine. The tracks in said yard
ran east and west. Two of them, those to the south,
were passenger tracks, the rest to the north were
freight and side tracks.

A photograph in evidence shows the place, except
as to cars standing on the freight tracks, to be pres-
ently mentioned. In the picture the eye looks to the
west, the south side being to the left and the north
to the right. We cannot do better than to reproduce
it; for all sides admit its accuracy and it depicts the
scene at one stroke thus:

The heavy, dark, irregular line cutting the yard tracks indicates the road-crossing and the line of travel of decedent. As decedent, heading south, reached the first rail of the last track on the left, she was struck by the pilot-beam of an engine pulling a passenger train east and running very fast, say, forty or fifty miles an hour, and was instantly killed, being tossed back north and. to the east a great ways. We will call the first track on the left No. 1, the next No. 2, the next No. 3, and so on. From track No. 1 to track No. 3, was the rise of 28 feet. Commencing on the north side of the yard and coming on down south to track No. 3, freight cars (mostly loaded coal cars) were standing at the time on some of the tracks both east and west (more to the west than to the east) of the road crossing, leaving the crossing free. The witnesses vary on the distance of those cars from the crossing and on whether they were in strings or broken up, but the variance is immaterial. There was testimony that despite those cars men walking over these tracks, if attentive, could see the top of the east going passenger train to the southwest on track No. 1 and the smoke and smokestack of its engine, at that time belching black smoke from the fireman's feeding his fire. But whether the eye of decedent, a person five feet two inches high, could clear the freight cars to her right as she crossed the freight tracks, and see the eastbound passenger train, is not shown. I think it may be assumed decedent could not see the train until she got within twenty-eight feet of track No. 1, that is, till she got over track No. 3. When she reached that point, and while she was passing over said last twenty-eight feet, there was no obstruction to her view to the west for one mile. The passenger tracks were straight and on a level, or very slight down grade to the east, and, had she glanced to the west, the train was in full sight during all the time she traveled that twenty-eight feet. Though the day was clear there

was a stiff wind blowing in gusts, some of plaintiff's witnesses say from the south, some from the west and some from the southwest. It was a wind hard to face for it carried sand and dust, the region being sandy and loose sand lying about.

At some time and at some distance from track No. 1 not clearly shown, on her trip over this crossing, there was testimony that decedent took hold of the rim of her hat with one hand and pulled it down in front of her face or to the right side of her face, obviously as a wind shield or to hold her hat on her head. The size of the hat rim was not shown. There were two eye witnesses following fifty feet behind her and observant of her conduct. One of plaintiff's witnesses described her as walking right along with her head bent a little down like a person might in a strong wind. Another describes her "as walking along like a girl would, holding her hat." In that fix she walked leisurely without stop over this twenty-eight feet in an ordinary walk, never looking to the west or listening, so far as human eye could see, and met her death at the end of the engine pilot-beam as she reached the north rail of track No. 1. The rumble of this train was heard by some of plaintiff's witnesses, who were near the crossing, for a mile to the west. By others it was shown the train made "no noise." There is no dispute but what the engineer was at his station on the south side of the engine cab and alert on his outlook. He did not see decedent and testified the boiler of the engine would not admit of it, she coming from the north side. There is no dispute but what the fireman was shovelling coal to feed his fire, to make steam enough to carry the train through the intricate network of tracks lying to the east as he approached Kansas City, so he might uninterruptedly assist in the outlook necessary there. He did not see decedent. Neither of them heard of the accident until the next morning.

On plaintiff's behalf there was testimony that no whistle blew or bell rang as the train approached and crossed the public road. *Contra,* on defendant's behalf there was testimony that an automatic engine-bell was set ringing a mile west of the place and thereafter rang continuously up to and over the crossing and until the train reached the station at Kansas City. Also that the crossing whistle sounded at the regulation place.

(*Note:* The statutes of Kansas, read into the record, require that, except in cities and towns, a steam whistle attached to each locomotive engine shall be sounded three times at least eighty rods from the place where the railroad crosses any public road or street, and prescribes that the corporation shall be liable for all damages sustained by any person by reason of such neglect. Other statutes, read into the case, provide that an action such as this shall survive in favor of the next of kin. But, whilst the petition counts on the omission of the statutory signals, it will be observed that plaintiff's instruction did not put that issue to the jury. The rule is that what does not appear among the issues submitted is the same as if it it did not appear at all, hence we pass that issue by.)

We come now to a class of facts bearing on the capacity, the maturity, of decedent, all established by plaintiff's own proof. She was within ten days of fifteen years of her age, a "good-sized girl of her age," weighing over one hundred pounds and within half an inch of being as tall as her mother, to-wit, five feet, two inches. Let her mother, the plaintiff, tell the story and the whole of it on the point, viz.: She was "bright and intelligent." She was next to the oldest in a family of five children. The mother "would go away and leave her with the whole care of the children." She "took care of them as good as" the mother could. She was earning seventy-five cents a day in Proctor & Gamble Soap Factory where she had

been employed a week. "In general housework she could do as good as" the mother could. She could sew on the machine in plain sewing as "good as anyone could," made clothes for the children, was perfectly healthy, and an extraordinary strong girl for her age. "She used to go right along with me," the mother said, "and in lifting or moving, cleaning house or anything she could lift as much as I could or in moving things do it just as easy as I could." She was about to enter high-school, having practically finished the eighth grade in one of the schools of Argentine. She could "cook and wash and iron and scrub." She nursed and took care of the children. Her hearing was good. Her eyesight was good. She was familiar with the crossing, having crossed there whenever it was needful. In cross-examination of the mother the following appears as the final word:

"Q. And judgment and discretion, everything, above the ordinary girl of fourteen? A. Well, she had awfully good judgment.

"Q. She was nearly fifteen, I believe? A. Yes, sir.

"Q. And from what you say about her I conclude that you regarded her as superior in judgment, capacity and understanding, to the ordinary girl of fourteen? A. Yes, sir, I did.

"Q. She was a very bright girl? A. Yes, sir.

"Q. And more than ordinarily intelligent? A. Well, she was intelligent.

"Q. Do you know of any trouble that she had at this time on her mind, or anything of the kind? A. No, sir.

"Q. You don't know, nothing that you know of? A. No, sir, and I expect I would have known it if there had a been."

There were Kansas statutes read into the record by both sides. So, many decisions of the Supreme Court of that State were offered. All necessary ref-

erence thereto will appear in due course in the opinion, if questions dealt with by them are reached as decisive. While from one statute introduced it appears that the common law is recognized in that State, no statute formally adopting it, as of this, that or the other date, was put in.

On such record the question springs: Did defendant's demurrer to the evidence lie? We are of opinion it did and that the court erred in refusing it, because:

(a) At the doorway of the case we are relieved from all embarrassment on the question whether decedent, on the facts here, was *sui juris* as a matter of law, and to be held to the same accountability as an adult. Plaintiff deliberately chose her trial theory on

Youth:
Sui Juris:
Admitted by
Instruction.

that score and settled it for herself. In the excerpt from her instruction reproduced, it will be observed she put her case to the jury on the concession decedent was negligent. She did not put it to the jury to take into account her youth, judgment, intelligence or maturity and therefrom find her contributory negligence or the lack of it. She took the bits in her own teeth and disposed of it by assuming her daughter guilty as a matter of law, constrained to that course doubtless by the decision of the Kansas City Court of Appeals when the case was up once before. No other instruction asked abates the rigor of the foregoing pronouncement or makes her negligence an issue. By that token, then, there fell out of the case for purposes of the law, and once for all, vexed questions on the heedlessness, the buoyancy, the hopefulness, the inadvertence, the lapses, the daring of youth as elements in ascribing blame to or affixing responsibility for an act. We must treat decedent as an adult; for it is a clear principle of law that a trial theory abides for appellate purposes. That, in the matter of substance, the case heard above must be the very case tried below. [Walker v. Railroad, 193 Mo. l. c. 483 et seq.] Thereto the

law accords with the fitness of things and the common sense of the matter.

There was testimony, possibly introduced to show a confused and bewildering situation, to the effect that a switch engine was working on some of the north tracks of the yard and to the east of her a block or half block. But, observe, she had already crossed those tracks. There was some testimony, too, that a block west of the crossing and south of but adjacent to, track No. 1, a ditch was being dug and a ditching engine was standing in this ditch. But, observe, she knew this ditch did not extend to the crossing and if her attention had been diverted west to this ditching engine the same glance would have taken in the passenger train. We lay aside all this testimony as immaterial. This is so, because it was alone competent on the issue of decedent's negligence. With the concession of her negligence, as here, it fills no office.

Assuming, then, as did plaintiff, that decedent was *sui juris*, a woman in judgment and guilty of an inexcusable act of negligence leading up to her death, can there be a recovery on this record?

(b)   Whether there was evidence carrying to the jury the issue of defendant's negligence, we need not discuss. Let the case proceed on the theory, most favorable to plaintiff, viz.: that there was evidence tending to show negligence on the part of defendant in the particulars put to the jury in the instructions quoted. Let us assume for argument's sake the jury was warranted in finding that issue against defendant. Then, with so much granted, we have a case where a railway company negligently ran a fast passenger train over a public road crossing without any outlook on the north or fireman's side of the engine whereby those in danger on the north could be seen and warned, and without any warning whatever. We also have a case where a person without looking and without listening, when to listen was to hear and to look was to

see (that is, negligently) approached a live railroad track on foot leisurely at an ordinary gait and reached the crossing place at the same instant of time the engine did, and, the two meeting there, the person was instantly killed, as of course. What disposition does the law of negligence make of that case?

(c) At our bar it was argued by all hands that the law of negligence as administered in Kansas applied. In briefs it is not so clear that counsel put all their eggs in that one basket. They apparently dare not put that lone issue to the touch, to win, or lose thereby. If it were material to decide the point, we would do so; but since, on this record, as presently appears, the main question, liability, must be decided the same way whether approached from a Missouri or a Kansas angle, it becomes an immaterial proposition, a mere blind alley or *cul de sac*, which when explored leads to nothing decisive in this case. The student who investigates with an eye to the storing up of academic learning on the point may consult with profit such cases as Root v. Railroad, 195 Mo. 348; Mathieson v. Railroad, 219 Mo. 542; Yost v. Railroad, 245 Mo. 219; Newlin v. Railroad, 222 Mo. 375; Fogarty v. Transfer Co., 180 Mo. 490.

(d) In this State, as everywhere, it has always been a general rule of law that, given the negligence of a defendant and an injury, then the concurrent contributory negligence of the injured party defeats the recovery. Such injury is the product of the joint fault of the two; both do it, and the law affords no remedy. It leaves the injured party to lie in the bed he helped make for himself.

(1) For reasons of humanity, however, there has been allowed an exception to that general rule, as well established as the rule itself. So that the law in this jurisdiction also is that when the negligence of the injured party has put him in peril so distant from an oncoming car or locomotive that those operating it can

by warning (or by stopping when possible and necessary) avoid injury to such person, after such operatives discover the peril (or, where a duty to look arises, might have discovered the peril) then liability for injury springs. On such hypothesis the act of negligence of the injured party is not deemed by the law so far forth concurrent as to defeat recovery, but the negligence of defendant is deemed the proximate cause of the injury, and, hence, actionable.

This is one phase of what is called by our courts the humanity doctrine. In some jurisdictions it is called the last-chance rule or last-clear-chance rule. In some, the same result is reached under the doctrine of comparative negligence. In some, the same result is reached by a benignant, liberal (and flexible) application of the maxim, *Causa proxima, non remota, spectatur*. And in some cases, to work out justice, the concepts of wilfullness and wantonness have been levied on to avoid the effect of contributory negligence, the universal rule being that contributory negligence is no defense to a wanton or wilful act. We cite only one case. [Murphy v. Railroad, 228 Mo. l. c. 79 et seq.] From one discern all.

(2) But running parallel with a line of cases on all-fours with the Murphy case, supra, is another line of railroad negligence cases announcing this proposition: Granting defendant's negligence in outlook, signals, slacking or stopping, yet where the injured party who is *sui juris* negligently moves from a place of safety to a place of danger so close before the engine or car that by ordinary care his injury cannot be averted, then there is no room for the play of the humanity doctrine: *contra,* the doctrine of concurrent negligence is left to operate as a defense in full vigor and rigor. [Watson v. Railroad, 133 Mo. l. c. 251; Green v. Railroad, 192 Mo. 131; Schmidt v. Railroad, 191 Mo. 215; Dyrcz v. Railroad, 238 Mo. l. c. 47; Burge v. Railroad, 244 Mo. 76; Sites v. Knott, 197 Mo. l. c.

709 et seq.; McGee v. Railroad, 214 Mo. 530; Walker v. Railroad, 193 Mo. 1. c. 479 et seq.; Rollison v. Railroad, 252 Mo. 525; Stotler v. Railroad, 204 Mo. 619; Laun v. Railroad, 216 Mo. 563; Bennett v. Railroad, 242 Mo. 125.]

The doctrine just announced sustains the demurrer from the Missouri viewpoint, unless the proposition we are about to discuss saves the case.

(3) The duty to use care to avoid injury on the hypothesis discussed in paragraph 2, arises only on discovery of peril, or on negligence in discovering it when there is a duty to keep an outlook and make discovery of the peril. In either hypothesis it is essential to note that there must be *peril,* a danger zone. To illustrate, one standing on the track at a crossing is in the danger zone. One, a child, *non sui juris,* approaching the track and able to reach it before the engine, is in the danger zone by virtue of being *non sui juris.* One driving on a track is in the danger zone when his horses approach so close, or at such a gait, as to show a present intention to cross. But a person *sui juris* approaching a railroad track at a crossing, at an ordinary gait on foot at right angles to the track or angling toward the engine and in complete control of his own movement, is not in the danger zone until he takes the last few fatal steps, or, oblivious to his danger, does such things as fairly indicate a present intention to take them. The danger zone on such hypothesis is narrow indeed—a step or two or three at most. We have uniformly ruled that the engineer seeing such a person approaching the track on foot in an ordinary walk may act on the presumption the person will stop before stepping thereon immediately before his engine. He has right to rely in the first instance on such person looking and listening, and, where looking is seeing and listening is hearing, he has a right to presume such person knows the peril and will stop. [See authorities supra.]

The question, then, shifts to this: Was there anything in the mere fact that decedent, woman fashion, was holding her hat rim down in a wind and had her head bent a little down that takes the case out of the general rule above discussed, and shows that she *obviously* intended to walk to her death? We think not. The train noise carried with the wind and fully reached the fatal spot. The lowered hat rim in front did not affect her hearing, nor would it obviously affect her seeing when a mere glance, a twist of the head, would take in the train. A friendly witness, within hailing distance, saw her actions and the train and failed to warn her. Why? Because he did not think she would take the last step. It is not amiss to let him tell that part of his story, thus:

"Q. Did you call to her to stop? A. No, I didn't know she was going on the track.

"Q. Why didn't you call her to stop? A. Why, I didn't know she was going on the track.

"Q. Did you think she was going on the track? A. Well, a person would naturally suppose she wouldn't.

"Q. You saw the train? A. Yes, I saw the train.

"Q. You suppose she saw it, do you? A. No, I don't think she did.

"Q. Did you then suppose she saw it? A. I supposed she heard it coming, yes."

We think it sound doctrine in this jurisdiction, that there is nothing in this case to relieve it from the general rule that one who is about to go on a railroad track owes it to himself to look and listen. Self-preservation is nature's first law and nature's imposed duty. Every man lives, moves and has his being within that law and duty. He cannot escape therefrom if he would and ought not if he could. Not to obey that law and use one's own God-given senses in as primal a duty is tantamount to casting the whole

burden of saving one's life or limb on the other party. Why should that be done? We cannot well write the law to be that everyone owes to A the duty to preserve A's life or limb, *except A himself.*

(c) We come next to consider the doctrine of the Supreme Court of Kansas in the foregoing particulars. The doctrine of that learned court is much like our own in negligence law. Where the two courts differ on some phase of the humanity rule, the Kansas doctrine lends, we think, less countenance to recovery than our own. We shall not enter upon an exposition of the Kansas doctrine; but content ourselves with the pronouncement just made. The authorities supporting it are abundant and as uniform as possibly can be where courts deal with a subject-matter of such infinite variety of detail as the law of negligence. [Dyerson v. Railroad, 74 Kan. 528; Coleman v. Railroad, 87 Kan. 190; Dunlap v. Railroad, 87 Kan. 197; Marple v. Railroad, 85 Kan. 699; Beech v. Railroad, 85 Kan. 90; Jones v. Railroad, 85 Kan. 313.]

When rightly understood and applied there is nothing in the decisions of that court, to which plaintiff cites us, at all modifying the reasoning and conclusions of the cases just cited. We will not stop to analyze them.

We must hold, then, that if the case at bar be ruled by Missouri doctrine or by Kansas doctrine, matters not a whit. To drop into the phrase of the logicians: There is a dilemma and plaintiff, impaled on either horn, cannot escape between the horns.

(f) It is argued that the decision of the Kansas City Court of Appeals on a former appeal (151 Mo. App. 364) is *res adjudicata* on the question whether there was a case for the jury. If the whole case did not come here on the present appeal, but some of it was left behind, there would be substance in that con-

tention, as to the part left behind. In Viertel v. Viertel, 212 Mo. 562, a divorce suit where the right to a divorce was finally settled on appeal by that court, but the question of alimony was open and from a final judgment below on that issue the appeal came here, we held the judgment of that court on the divorce itself *res adjudicata.* In this appeal the whole case is here, and, while opinions of our esteemed brethren of that court are persuasive, and generally followed by us, they cannot bind this court on a new appeal in the same case on either the doctrine of *res adjudicata,* or the law of the case. [Hennessy v. Bavarian Brew. Co., 145 Mo. l. c. 115; Paddock v. Railroad, 155 Mo. l. c. 534.] We are not willing to follow the pronouncement made by the Kansas City Court of Appeals on the demurrer to the evidence then held in judgment.

Besides all that, the evidence was not the same at both trials. We have now the testimony of the engineer and fireman which that court did not have. The demurrer seeks and searches all the evidence.

The point is ruled against plaintiff.

The conclusions reached make rulings on other interesting questions bristling in briefs, not worth while. A safe rule is: Never do to-day in an instant case what one might better do to-morrow in some other case.

Let the judgment be reversed. *Woodson, Graves, Walker* and *Faris, JJ.,* concur; *Brown, J.,* concurs in the result; *Bond, J.,* dissents.