FARMERS BANK OF DEEPWATER, Respondent, v. JOHN OGDEN, Defendant; GLOBE SURETY COMPANY, Appellant.

Kansas City Court of Appeals, Dec. 5, 1915.

1. **PRINCIPAL AND SURETY:** Guarantor Insurer: Contract. A company which for hire executes a bank employee's bond as surety is not entitled to that full degree of protection by con-

struction of contract which is accorded to an ordinary insurer who signs for accomodation. Such company is a guarantee insurer and doubtful terms in the contract are construed most strongly against it.

2. ——: Contract: Construction. Though a surety company signing a bank employee's bond is an insurer, yet it is entitled to have performed the plain terms of its contract which should not be refined away by construction.

3. ——: Defaulter: Crime: Trust: Larceny. "Defaulter" as used in a bank president's bond to the bank signed by a surety company, does not mean merely any kind of criminal conduct. It means one who has violated his trust in regard to funds which h---- b̲cen entrusted to him. Therefore knowledge by the bank ᴜ.ᴀ... .ᴄ president had once been sent to the penitentiary for stealing harness from a barn was not knowledge that he had been a defaulter.

4. BANK PRESIDENT: Bond: Forgery: Jury Question. A bank president gave bond for faithful discharge of his duties, with a surety company as surety for hire. The bond was conditioned that the company should be notified by the bank if its officer suspected, or information came to them that the officer had committed any act indicating that he was unreliable, dishonest or unworthy of confidence. The officer signed the cashier's name, with his own as president, without authority and the cashier and directors learned he had done so and yet did not notify the company. There was evidence tending to show that the officer did not intend a wrong, that no one thought him guilty of a wrong, in the circumstances shown. It was held to be a. question for the jury whether the act was one requiring notice under the bond.

5. ——: Agency. A bank president being applied to by a customer for a loan not being unable to accomodate him at the time, introduced him to another bank and obtained a "credit card" in the customer's favor for the amount of the loan and this was endorsed to the president's bank and delivered to him. He surreptitiously erased the customer's name and substituted his own; and then deposited the credit with his bank and used the proceeds. It was held in an action against his surety that he was acting as president of the bank and the surety was liable.

6. Bank Stock: Security. A bank cannot accept its own stock in security for an original loan; but it may accept it to save a loan already made.

Appeal from Henry Circuit Court.—*Hon. C. A. Calvird*, Judge.

AFFIRMED.

*Haff Meservey, German & Michaels* and *Jas. D. Lindsay* for appellant.

*W. E. Owen* and *Parks & Son* for respondent.

ELLISON, P. J.—Plaintiff is a banking institution and defendant a surety company issuing contracts of surety insurance indemnity to banks against loss through the failure of its officers "to well and faithfully perform the duties" pertaining to their respective offices. The present case arises out of a bond given by John Ogden, plaintiff's president, with defendant as surety. The judgment in the trial court was for the plaintiff.

The specific undertaking for which defendant stands as surety is "to make good and hold the employer (plaintiff) harmless for any loss occasioned through the dishonesty of said employee, or through any act of his done or omitted, in bad faith, through negligence or without authority, until all his accounts with the employer have been fully settled and satisfied, occurring at any time after," etc. The bond is executed upon fourteen conditions, the first and fourth, being those here involved, are as follows:

"First, If the employee has at any former period been a defaulter and if such fact be known to the employer, at the time of the execution of this bond, or at the time of the appointment of such employee by the employer, this bond shall be void and the employer shall not be entitled to recover hereunder for any loss sustained by or through any act of such employee."

"Fourth. If at any time after the beginning of the term for which this bond is written, the employer, or any officer of the employer, suspect, or if there comes to the notice of the employer, or any officer of the employer, any act, fact or information tending to indicate that the employee is or may be unreliable, deceitful, dishonest, or unworthy of confidence, the employer

shall immediately notify the company and if he fail or neglect so to do, the company shall not be liable for any act of the employee thereafter committed", etc.

Ogden came to Deepwater, the scene of the transactions resulting in this litigation, from another part of the state, where, in his youth, he had a criminal history unknown in his new location. He was a man of good habits, and amiable manners. He was a church member and took much interest in the betterment of conditions materially and socially, and had been elected Mayor of the town. He so impressed himself upon the community that he took leading position in its affairs with general consent, approbation and confidence. After several years' residence there in which he prospered socially and financially, he organized the plaintiff bank and became its president. In that position he proved too weak for the tempting opportunities for wrong doing and soon began the career which wrecked the bank and again made him an inmate of the penitentiary.

The first count in the petition is based upon a transaction by which Ogden, acting as plaintiff's president, on November 11, 1912, obtained a credit card of the Peoples National Bank of Clinton, a correspondent of plaintiff, for $1498.80, "for the use of A. J. Tally." The Peoples Bank gave the card to Ogden, as President of plaintiff bank, and he surreptitiously erased Tally's name on the card and inserted his own and then deposited it with the assistant cashier of the plaintiff bank and appropriated the proceeds to his own use. Defendant denies liability on two grounds; one that plaintiff learned of Ogden's having committed a forgery in what is called the O'Hare note, and failed to notify defendant as required in the first and fourth conditions just quoted; and, second, that Ogden was not acting as plaintiff's agent in the Tally transaction.

The bond as originally executed took effect the 31st of August, 1911, to continue in force for one year.

When it expired it was renewed for another term, expiring in August, 1913. The following incident came to the knowledge of plaintiff's officers in October, 1912. Some time in December, 1911, Ogden forged a note for $1800, payable to plaintiff bank, purporting to be executed by George O'Hare. He negotiated this note to the Lowry City Bank, endorsing it with own name as president of plaintiff bank and also himself signing, or endorsing the name of the plaintiff's cashier thereon. A circumstance, not connected with any suspicion of the note caused the Lowry City Bank to ask that it be paid and to that end its cashier spoke to plaintiff's cashier about it one evening while the latter was at a neighbor's house, and the latter denied having endorsed the note. It was then shown to him and he looked at the endorsement only. He saw Ogden had endorsed it as president of the bank, and that his endorsement as cashier, was not his signature but was in Ogden's handwriting. He then handed it back to the Lowry bank's cashier, saying that he would see Ogden about it next morning. In a few days Ogden paid the note to the Lowry bank, and thus it became a closed incident so far as that bank was concerned.

It afterwards developed that O'Hare's name as maker, was also forged, *but this was not known at the time we are referring to.* Plaintiff's cashier having thus become possessed of knowledge of Ogden having signed his name to the endorsement without authority, did not notify defendant, but he did speak of it to the vice president and to one of the directors and neither of these notified the defendant. The latter therefore insists that it is not liable on the Tally transaction under that part of the fourth condition above quoted which requires notice when the employer becomes possessed of knowledge of "any act, fact or information tending to indicate that the employee is or may be unreliable, deceitful, dishonest, or unworthy of confidence," and it asked and the trial court refused, an

instruction to that effect. The court took plaintiff's view that Ogden's act in signing the cashier's name did not come within the terms of the condition, unless it was a forgery, and that there was room for the conclusion by plaintiff's officers that Ogden had not intended to commit that crime. Adopting this view, the court made a jury question of it by an instruction to the effect that information these officers had must be such as would lead a reasonably prudent person, under the same or similar circumstances and surroundings, to believe that Ogden was unreliable, deceitful, dishonest and unworthy of confidence.

Justification for this view is said to be found in testimony given by these officers and others, that Ogden was thought to be a man of high character, that he had everybody's confidence, that he was a man of great egotism and self assertion who made himself the head and front of every transaction with which he was connected; and that these officers attributed the act of signing the name of the cashier of a bank of which he was president, boldly, without attempt at disguising handwriting, to such characteristic. Besides, the cashier of plaintiff bank, as we have said, had no knowledge or suspicion that the O'Hare note was a forgery. He knew that Ogden had sold a farm to O'Hare and had taken a note for part of purchase money, and it never occurred to him that Ogden was doing anything more than assuming a right, as president of the bank, to endorse it with the cashier's name along with his own. He knew him as a prosperous man living in the "finest home" in the town and loaned him $500 of his own money the Monday following this information. The director testified that "it did not make me question John Ogden's honesty a bit. . . . I just thought he did it because he and Grob (the cashier) were there together in the bank and that he could sign his name to it too."

The propriety of the court's action on that instruction is the question for decision. It may be stated at the outset that defendant's obligation as surety is not so limited and circumscribed with protective requirements as that of an ordinary surety who acts for accomodation without gain to himself. Organized companies and corporations have now taken up suretyship as a business which they prosecute through the country for profit, and their engagements are considered more in the nature of guaranty insurers. These contracts are made out by themselves and their terms, when subject to two meanings, are construed in favor of the party to be indemnified. [American Surety Co. v. Pauly, 170 U. S. 133, 144; Roark v. Trust & Deposit Co., 130 Mo. App. 401; Boppart v. Surety Co., 140 Mo. App. 675; Rule v. Anderson, 160 Mo. App. 347; The People v. Rose, 174 Ill. 310.]

But as said by this court in an opinion by Judge JOHNSON "the express limits placed by such contracts on the obligation of the surety must be respected, else courts will be making contracts for persons which they did not make for themselves." [Moore v. Title Guaranty Co., 151 Mo. App. 256.] And so it is said by the Supreme Court of the United States, that "this rule cannot be availed of to refine away terms of a contract expressed with sufficient clearness to convey the plain meaning of the parties, and embodying the requirements compliance with which is made the condition to liability thereon." [Guarantee Co. v. Mechanics Co., 183 U. S. 402, 419.]

In considering this phase of the case we are not overlooking a construction of the contract which we think should be given to it, viz., that where it turns out there was guilt, the surety company should have been given an opportunity to investigate for itself, and that the bank's bona-fide conclusion that nothing was wrong ought not to bind the company. The real question is,

where in fact there was guilt, has anything come to the knowledge of the bank in regard to the employee, which can reasonably be said to require inquiry or investigation. But while this is true, it is, of course, not every act of a bank officer coming to the knowledge of the bank which must be reported to the surety company. The act must be of such character as to impress a business man of ordinary prudence and judgment that it should be looked into to see if it fell within the terms of the condition above quoted. If the act be such, the circumstances considered, that all reasonably prudent men of ordinary judgment, would have but one opinion of it, that is, to bring it to this case, would consider that it indicated that Ogden was either "unreliable, deceitful, dishonest or unworthy of confidence", then it would become the duty of the court, in the absence of notice, to peremptorily declare to the jury the defendant was not liable. But if the circumstances are such that an act which ordinarily might be bad appears to be so clearly innocent that men of ordinary prudence and judgment would think it did not even require investigation, the jury should be so instructed. We think this view is supported by American Surety Co. v. Pauly, 170 U. S. 133, 146, 147.

We think the claim that Ogden was not acting as agent for plaintiff in this Tally transaction is not sustained by the record. The facts are that Tally was a customer of plaintiff bank and desired a loan of $1500 and plaintiff bank did not feel able, at the time, to accommodate him, but Ogden, as its president, went with Tally to the Peoples National Bank at Clinton, introduced him, explained the situation and recommended that the latter bank make the loan, which was to be secured by chattel mortgage on some cattle. The bank agreed to make the loan in the following way: A chattel mortgage was executed (which, however, turned out to be invalid) and it made out a credit card to Tally for the amount reading "we credit $1498.80 for use of

A. J. Tally,'' and addressed it by endorsement to the plaintiff bank and delivered it to Ogden, with the agreement that the plaintiff bank should not pay out the money to Tally until one of its officers ''could come down and examine the chattel security.'' Every just inference and fair intendment disclosed in the record shows that the Clinton bank was dealing with Ogden as president of plaintiff bank. He received the credit card and substituted his own for Tally's name and placed it to his credit in the plaintiff bank, afterwards using the proceeds.

As we stated at the outset, it appears that Ogden when a ''boy'' had lived in a distant part of the State and that he had been convicted, with some others, of stealing a set of harness from a barn and sentenced to the penitentiary. This was some twelve or fifteen years before his coming to Deepwater. Two years before the organization of the plaintiff bank and in the midst of a political campaign, rumors prevailed that he had been in the penitentiary. Among others who heard these rumors, were several citizens who afterwards became directors of plaintiff bank. Upon this, defendant insists that plaintiff violated both the foregoing conditions of the bond. Defendant's agent who took the application for the bond, now in contest, also heard these rumors. But whatever influence the latter's knowledge may have on defendant's right, we do not think the foregoing conditions cover or apply to the point in question. The first is that if plaintiff knew that Ogden had ''at any former period been a defaulter.'' Information that one had served a term in the penitentiary for stealing a set of harness, is not information that he is a ''defaulter.'' One may be a bad man and have forfeited public confidence in many ways and yet not be a defaulter. This bond being a contract with a bank assuring the fidelity of one of its principal officers, makes clear that the word ''defaulter'' is used in reference to the wrongful misuse, or misapplication

of money with which the officer has been entrusted. "It describes one whose peculations have brought him within the cognizance of the law." [2 Words & Phrases, 1930; State v. Kountz, 12 Mo. App. 511.] In the sense here used, the word does not mean an act which may be merely a "default," or "fault," or "offense," even though the offense may be a felony; as for instance arson or rape.

Nor do the provisions of the fourth condition relate to knowledge of Ogden's past criminal history. It reads: "If at any time after the beginning of the term for which this bond is written," the plaintiff bank suspects, or notice comes to it, of his being dishonest, etc. This, as it states, refers to information which plaintiff may receive *after* the period the bond takes effect. So we conclude that no ground exists for interference with the court's action as it affects the Tally transaction declared on in the first count.

The second count in plaintiff's petition is based upon Ogden having wrongfully abstracted from the plaintiff, bank stock which he held in it and which he had pledged to plaintiff as security for money which he had theretofore borrowed of it. The judgment for plaintiff on this count was in the sum of $2112. An examination of the record shows abundant evidence to sustain the judgment. We think there is no substantial merit in defendant's claim that this stock was not, in fact, pledged and possession delivered to the bank. It was in a stock book, not in Ogden's possession, but placed in possession and control of the cashier in pledge as security for money then due the plaintiff, in whose possession it was to remain until the indebtedness was paid. The cashier kept it in the vault, and it seems clear that there was sufficient evidence to justify a finding of a pledge to the bank with possession in the cashier. The question was duly submitted to the jury by an instruction for plaintiff and defendant did not ask any on that subject.

But it is said the statute (sec. 1086, R. S. 1909), disables a bank from taking its own stock as security for a loan. The statute does forbid taking such security for a loan contemporaneously made, but it permits such security "to prevent loss upon a debt previously contracted in good faith."

It appears from the record that the State Bank Examiner closed the plaintiff bank and that he demanded, as a prerequisite to its reopening for business, that certain assets or claims owing to it (including Ogden's indebtedness) "be eliminated from the assets" and cash substituted. To this end there was a meeting of the directors and they "took up" that indebtedness, but with the express understanding, stated on the minutes, that any money recovered by the bank on the bond in suit, "shall be turned over to these directors to reimburse themselves for this advancement." Other parts of the minutes of the meeting recognize that the bank was to prosecute the bond. In these circumstances, defendants point that plaintiff's claim against Ogden was paid and its right of action on the bond was destroyed is not well made. Exactly the contrary is shown to have been intended by the parties. We may add that no defense of this nature was pleaded.

There were some minor points made which we think should not affect the judgment. Our conclusion on the principal matter involved in the oral and written arguments being that it presented a jury question and it having been duly submitted, it is our duty to accept the verdict as concluding the questions of fact. The judgment is affirmed. All concur.

## ON REHEARING.

PER CURIAM.—We granted and have had a rehearing of this case and only care to add to the opinion delivered at the first hearing, the following: Defendant seeks to enlarge its defense so as to cover theories not

advanced to the trial court, nor to this court at the first hearing. It is now said that the O'Hare transaction shows not only that Grob, cashier of the plaintiff bank, became aware that Ogden was guilty of forgery in having signed his name as cashier on the back of the O'Hare note, but that he "knew that Ogden has obligated his bank on a note in which it had no interest." Defendant then proceeds to enlarge upon this by arguing that even though it be conceded that Grob did not think Ogden had intended a forgery, he must have known that he intended to obligate the bank; and hence was bound to have notified defendant as provided in the bond.

This new theory should be disposed of substantially along the same lines that we disposed of the point originally made as to the forgery.

But aside from this, it is a familiar rule that an appellant is only permitted to advance on appeal such theories as he advanced at the trial (Daugherty v. Gangloff, 239 Mo. 649, 660; Henry Co. v. Bank, 208 Mo. 209, 226; State ex rel. v. Ice Co., 246 Mo. 168, 201); and also such points as he preserves and makes at the hearing on appeal as grounds for reversal. [Sharp v. Ry. Co., 139 Mo. App. 525, 534.] In this case the point now urged was not offered to be submitted by defendant at the trial, either in its instructions given or refused. The instruction submitted in the O'Hare transaction was confined by defendant to the matter of forging Grob's name. If the defendant wished to present the point now made, it should have embodied it in a plain instruction to that effect. Not having done so the point is considered to be abandoned. [Keele v. Ry. Co., 258 Mo. 62, 75.] It is true that defendant asked a general demurrer to the evidence which the court refused and it is now sought to make that request cover this new theory. But it cannot be done; for it is decided in Chinn v. Naylor, 182 Mo. 583, 594, 595, that "a general demurrer to the evidence cannot

be used for the purpose of injecting into a case in the appellate court, questions that were not in some manner *specifically* called to the attention of the trial court, and upon which it cannot be seen that the trial court *had an opportunity to and did rule.*"

That defendant has no right, at this day, to bring forward this theory is further made manifest by its action in this court. Defendant's statement of the case prefixed to his brief makes no reference to the point. In that brief defendant set out eight special assignments of errors and this point is not mentioned. The brief itself, which the statute requires to specifically point out the errors upon which a reversal of the judgment is asked, does not include the point. It complains of the refusal of instruction No. 1, which is upon the question of forgery only and the duty of plaintiff to have notified defendant of such forgery. The brief is made up of propositions of law and authorities cited to sustain such propositions, together with a running written argument on these, and nowhere is the point suggested that it now brought forward as having been overlooked by the court.

It is intimated by defendant that plaintiff recognized that such point was in the case by its instruction No. 3. If that were true, we do not see how it would relieve defendant of its duty to make all its points of defense in the trial court, and of its duty to specifically state in this Court, its points for reversal. But the instruction referred to does not recognize the point now urged. It clearly shows, with other parts of the case, that the only idea in the mind of the counsel in the trial was that Ogden had committed a forgery.

A re-examination of the record in connection with the arguments of counsel, have convinced us that the cause was properly disposed of in the original opinion. The judgment is therefore affirmed. All concur.